In the Matter of BEVILL, BRESLER & SCHULMAN, INC., Debtor.

Richard W. HILL, Trustee under S.I.P.A. for the liquidation of Bevill, Bresler & Schulman, Inc., Plaintiff,

v.

SPENCER SAVINGS & LOAN ASSOCIATION, Defendant-third party plaintiff,

v.

CHASE MANHATTAN BANK–LONDON, Third party Defendant.

Richard W. HILL, Plaintiff,

v.

HAWTHORNE SAVINGS & LOAN ASSOCIATION, Defendant.

Civ. No. 85–2224 (DRD).

Adv. Nos. 85–0180 (SIPA), 87–530.

United States District Court, D. New Jersey.

Jan. 10, 1989.

As Amended Jan. 13, 1989.

---

**820**

McCarter & English by Hayden Smith, Jr., Newark, N.J., for Richard W. Hill, trustee under the Securities Investor Protection Act for the liquidation of Bevill, Bresler & Schulman, Inc.

Ross & Hardies by Helen Davis Chaitman, Somerset, N.J., for Spencer Sav. & Loan Ass'n and Hawthorne Sav. & Loan Ass'n.

## OPINION

DEBEVOISE, District Judge.

### NATURE OF THE CASE

This is an adversary proceeding brought by Richard W. Hill, the Trustee of the debtor Bevill, Bresler & Schulman, Inc. ("BBS") under the Securities Investor Protection Act ("SIPA"), against two former customers of BBS, Hawthorne Savings & Loan Association ("Hawthorne") and Spencer Savings & Loan Association ("Spencer"). The Trustee is seeking partial summary judgment pursuant to Fed.R. Civ.P. 56 on his claim that certain transfers involving Hawthorne and Spencer violated section 549 of the Bankruptcy Code, as incorporated by section 78fff–2(c)(3) of SIPA.

### FACTS

The following facts are either undisputed or, having been alleged by Hawthorne and Spencer, are assumed to be true for purposes of deciding the present summary judgment motion.

*The Parties:*

Spencer is a New Jersey chartered savings and loan association. Hawthorne is a California chartered savings and loan association. Prior to May 8, 1985, BBS was a licensed broker-dealer of securities doing business in the state of New Jersey. The Trustee is the trustee under SIPA for the liquidation of BBS.

*Spencer's Relationship with BBS:* [1]

From approximately 1983 to 1985, Spencer purchased securities and debt instruments through BBS, utilizing the services of its broker at BBS, John Zeimitz ("Zeimitz"). Zeimitz dep. at 11. Spencer followed an extremely conservative investment policy under which it took physical possession of all securities it purchased. Orofino aff. par. 3; Zeimitz aff. par. 3; Zeimitz dep. at 56.

In order to lock into a slightly higher interest rate than was available on domestic certificates of deposit, on occasion Spencer purchased Eurodollar certificates of deposit ("Euro CDs") issued in London. Orofino aff. par. 2; Zeimitz aff. par. 4. Again, Spencer was very conservative with respect to its investments and purchased Euro CDs only from the 25 largest banks in the world, and only Euro CDs which were issued in, and governed by the laws of England. Orofino aff. par. 3. When a representative of Spencer first talked with BBS regarding the purchase of Euro CDs, Zeimitz explained that Euro CDs are physical securities which cannot be taken out of England and which must be presented to the issuer in London for payment. Hence, Spencer could not follow its standard policy and take physical possession of the Euro CDs which it purchased through BBS. Orofino aff. par. 4; Zeimitz aff. par. 4 Zeimitz dep. at 61.

As a service to its customers, and in order to facilitate its own sale of Euro CDs, BBS established a safekeeping account at Chase Manhattan Bank–London ("Chase"), so that Chase could safekeep the Euro CDs

---

1. The text of this section is derived substantially from an earlier opinion in this matter dated February 10, 1988. In their papers submitted for this motion, Spencer and Hawthorne have adopted verbatim substantial portions of that opinion's section concerning Spencer's relationship with BBS.

of the customers of BBS. Zeimitz aff. par. 5; Orofino aff. par. 4; Zeimitz dep. at 13.

Zeimitz believed, and so advised Spencer, that Chase maintained a separate safekeeping account for Spencer pursuant to the telexed instructions which BBS sent Chase concerning each CD purchased by Spencer. Zeimitz aff. pars. 5, 6, 13, 14; Orofino aff. pars. 2–4; Zeimitz dep. at 13, 75–76, 96. Between April 26, 1984 and March 27, 1985, in reliance upon these representations, Spencer purchased through BBS 19 Euro CD's in the principal amount of $20 million. Spencer has submitted evidence that it would not have purchased Euro CD's from BBS without BBS's assurance that those CDs were being maintained by Chase in a separate safekeeping account for Spencer. Orofino 2 aff. par. 4 [2]. This assurance came in at least two forms. First, with respect to each Euro CD purchased by Spencer, BBS sent a telex to Chase instructing Chase to hold the CD "in safekeeping for Spencer." Orofino 2 aff. par. 5. Second, BBS sent Spencer a confirmation showing that the CD was held in safekeeping. Zeimitz Dep. at 35; exhibit B to Orofino 2 aff.

On Sunday, April 7, 1985, at 10:20 p.m., Bevill, Bresler & Schulman Asset Management Corp. ("AMC"), an affiliate of BBS, filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court. On the following day, April 8, 1985, the Securities and Exchange Commission ("SEC") filed a complaint against AMC, BBS and several other affiliated corporations and partnerships, alleging violations of the antifraud provisions of the federal securities laws.

Prior to April 8, 1985, Zeimitz had never heard of AMC and knew nothing about it. On April 8, 1985, Zeimitz attended a meeting at BBS at which he claims BBS brokers were assured that the AMC filing did not adversely affect BBS and that BBS was to conduct business as usual. Zeimitz dep. at 39–24.[3]

BBS brokers were nonetheless flooded with calls from concerned customers who had heard of AMC's filing. On April 8th, Zeimitz called Frank Orofino at Spencer and advised him, in view of the confusion concerning the role and activities of AMC, to move the 18 Euro CDs then being held for Spencer at Chase to an institution with which BBS had no relationship. Id. at 42–45. On the same day, Orofino arranged for the Euro CDs to be delivered to the Federal Home Loan Bank's safekeeping account at Bankers Trust Company in London ("Bankers Trust") Id. at 46.

After speaking with Orofino, Zeimitz, sometime after noon on April 8, 1985, instructed the back office personnel at BBS to telex Chase instructing Chase to transfer all of Spencer's Euro CDs "free" to Bankers Trust for the account of Spencer. Id. On April 9, 1985, at 7:20 p.m., BBS sent the telex pursuant to Zeimitz's instructions. As per the instructions of BBS, Chase completed delivery of 18 Euro CDs in the face amount of $19 million to Bankers Trust at 4:30 p.m. London time on April 10, 1985 (10:30 a.m. Eastern Standard Time). With respect to each of the Euro CDs of Spencer delivered to Bankers Trust, Spencer received payment from the issuer within a few days after its maturity date.

Late in the afternoon of April 10, 1985, approximately six hours after Bankers Trust received possession of Spencer's Euro CDs, Richard W. Hill was appointed Temporary Receiver of BBS and three affiliated corporations in the SEC action. As Temporary Receiver, Hill took control of all securities still in the actual or constructive possession of BBS.

On May 2, 1985, a number of creditors of BBS filed an involuntary petition for relief against BBS under the Bankruptcy Code. On May 6, 1985, the Securities Investor Protection Corporation ("SIPC") file an application for a protective decree pursuant to section 78eee of SIPA. On May 8, 1985, by Order of the District Court, Hill was appointed trustee for the liquidation of BBS under SIPA.

---

**2.** "Orofino 2 aff." refers to the affidavit of Frank Orofino dated January 20, 1988.

**3.** As noted previously in this case, there is no evidence that the SEC was responsible for these assurances. *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. 880, 889–90 (D.N.J.1988) (hereafter referred to as *Spencer I.*)

*Hawthorne's Relationship with BBS:*

Hawthorne first became acquainted with BBS in November of 1984 when Bill Manwald, a broker at BBS, called Douglas J. Herbst, the Vice President and Chief Financial Officer of Hawthorne. Herbst Aff. at par. 4. In December of 1984, Hawthorne made its first trade through BBS by purchasing a corporate note. *Id.* at par. 5. Hawthorne subsequently traded "a few corporate and/or government notes through Manwald at BBS." *Id.*

In late February or early March of 1985, Manwald informed Hawthorne about trading opportunities in Euro CDs. *Id.* at par. 6. After "numerous problems" and two failed attempts at completing a trade, Hawthorne eventually made its first purchase of Euro CDs through BBS. *Id.* at par. 7. Like Spencer, it was Hawthorne's practice to take physical possession of securities it purchased. *Id.* at par. 6. However, since the Euro CD's could not be taken out of London, Hawthorne made arrangements with Irving Trust in London to take physical possession of them. *Id.* Accordingly, the CDs from the first trade were deposited into a safekeeping account for Hawthorne at Irving Trust.

Soon after Hawthorne's first Euro CD transaction with BBS, Manwald approached it about two more purchases involving a $4 million Mitsubishi Bank Ltd. Euro CD and a $1 million Tokai Bank Ltd. Euro CD. *Id.* at par. 8. Herbst indicated to Manwald that Hawthorne was interested in these purchases, but that he had reservations due to the difficulties involved with Hawthorne's first purchase of a Euro CD. *Id.* Manwald suggested that BBS could set up a safekeeping account for Hawthorne's Euro CDs at Chase to facilitate a smoother transaction. *Id.*

Herbst insisted that the Chase safekeeping account must be Hawthorne's account, in Hawthorne's name. *Id.* at par. 9. After Manwald assured Herbst that this would be done, Herbst authorized the two new purchases on behalf of Hawthorne. Herbst requested that Manwald send him "all of the necessary documentation to set up a safekeeping account for Hawthorne at Chase." *Id.* at par. 10.

After returning from a two week honeymoon on April 1, 1985, Herbst found two letters in his mail from BBS. *Id.* at par. 11. These letters indicated that the two Euro CDs had been purchased and were being held in safekeeping at Chase. At this time, however, Herbst had not received any communications from Chase confirming that a safekeeping account had been opened for Hawthorne at Chase, nor had he received confirmation of the receipt of the CDs into such an account or the necessary documents for Hawthorne to execute which would establish a safekeeping account in its name. *Id.*

Herbst called BBS to obtain an explanation regarding the letters he had received and to inquire about the status of Hawthorne's safekeeping account at Chase. *Id.* at par. 12. Herbst was informed that Manwald had left BBS and Herbst was referred to Steve Perfit. Herbst states that the departure of Manwald in addition to the letters he received from BBS "caused [him] great concern." *Id.* This concern prompted Herbst to instruct Perfit to transfer the Euro CDs from the BBS account at Chase to Hawthorne's safekeeping account at Irving Trust.

■ On April 4, 1985, BBS sent a coded telex to Chase directing that the Hawthorne Certificates be transferred on April 9, 1985 from the BBS safekeeping account at Chase to an account at Irving Trust. Wood aff., par. 3 & exhibit A.[4]

*The Nature of English Euro CDs:*

There is a significant market for Euro CDs, evidenced by the fact that as of Octo-

---

**4.** In his affidavit of November 22, 1988, Herbst states:

> I understand that BBS attempted the transfer of Hawthorne's two CDs and the transaction "crashed" or failed. As a result, on April 4, 1985, BBS again instructed Chase to make the transfer. I understand, however, that the in-

structions from BBS to Chase to transfer the CDs were not received by Chase until almost 12:00 midnight on April 4, 1985, London time. April 5, 1985 was Good Friday and the London banks were closed. April 8, 1985 was also a bank holiday in London. As a result, the transfer of the Hawthorne CDs to Irving

ber 1986, there were $100 billion Euro CDs outstanding in the London market alone. Shay aff. at par. 5. Euro CDs generally offer higher interest rates than domestic CDs because the issuers are not subject to the many reserve and regulatory restraints which accompany domestic CDs. *Id.* at par. 4. These attractive interest rates apparently lure many American savings and loan institutions to invest in Euro CDs. These institutions make such investments to secure interest rates which exceed the interest rates on domestic CDs which they issue and are obligated to pay to their own customers.

Unlike American GNMA's and certain other securities, Euro CDs cannot be registered in the purchaser's name. Similar to American securities, however, Euro CDs state on their face that they are "Negotiable." Notwithstanding this fact, they do have certain features which are arguably contrary to the American concept of negotiability.

Euro CDs contain language that they are payable on maturity by a "Recognized Bank" in the United Kingdom. Costello aff. at 2–3. This reflects the fact that English law allows an issuer to redeem a Euro CD only if presented by one of the banks recognized by the Bank of England. *Id.* Moreover, Recognized Banks who are requested to collect CDs on behalf of those who are not customers of such bank "may be expected to make significant enquiries as to the provenance of the [CD] in the hands of the customer." *Id.* at 3.

From the date of their issuance until the date of maturity, Euro CDs are safekept at relatively few London financial institutions. In fact, eighty percent of all Euro CDs are safekept at Chase and First National Bank of Chicago in London. Goulty dep. at 269;

Shay aff. at par. 5. The rest are safekept at "two or three other, mainly U.S., banks in London." Goulty dep. at 269.

In the instant case, each of the Euro CDs purchased by Spencer and Hawthorne was purchased on the London market. Although there were minor differences in the language of the CDs, many of them contained the following language: "The rights and obligations herein shall be determined by the laws of England." Other Euro CDs specifically referred to the issuer in its statement of the governing law.

*The Present Controversy:*

With respect to Hawthorne and Spencer's transactions involving Euro CDs, the following has already been determined: 1) SIPA preempts English law; 2) the filing date (or commencement date) of this SIPA liquidation proceeding is April 8, 1985; 3) the date on which the value of the customer fund should be measured for purposes of determining the Trustee's avoidance powers under section 78fff–2(c)(3) of SIPA is also April 8, 1985. *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. 880 (D.N.J.1988) (hereafter *"Spencer I"*).

The present controversy involves the transfer of Euro CDs from a BBS safekeeping account at Chase to Hawthorne's safekeeping account at Irving Trust. It also involves the transfer of Euro CDs from a BBS account at Chase to the Federal Home Loan Bank's safekeeping account at Bankers Trust, a transfer which was for Spencer's benefit. The Trustee claims that both of these transactions are avoidable under 15 U.S.C. sec. 78fff–2(c)(3) and 11 U.S.C. sec. 549.

## DISCUSSION

*Summary Judgment Standards:*

Summary judgment is only appropriate where the moving party establishes that

---

Trust was not made until Tuesday, April 9, 1985.

Herbst aff. par. 13. However, Herbst does not provide the factual basis for his "understanding" and similarly, Hawthorne has failed to provide a factual basis for these conclusions. In fact, a copy of the April 4 telex sent by BBS to Chase partly contradicts Herbst's understanding of the situation. That copy states *"on settlement date 4–9–85* please deliver the following securities

from safekeeping free." Wood aff. exhibit A (emphasis added). Thus, the telex itself evinces the intent of BBS, as of April 4, that the securities were not to be delivered to Irving Trust until April 9. While on summary judgment Hawthorne is entitled to all reasonable inferences from the facts it alleges, Herbst's allegations here have been contradicted by documentary evidence and therefore cannot be accepted as true.

"there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g.* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.) *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). The Supreme Court has explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 574, 106 S.Ct. at 1348. All evidence must be viewed in a light most favorable to the party opposing the motion. *Wahl v. Rexnord*, 624 F.2d 1169, 1181 (3d Cir.1980). The foregoing standards must be applied when considering defendants' motion herein.

As a threshold matter here, the present status of distribution among creditors warrants some discussion. As noted in previous opinions in this case, SIPA contemplates equal distribution among similarly situated creditors. *Matter of Bevill, Bresler & Schulman, Inc.*, 59 B.R. 353 (D.N.J. 1986) (construing SIPA); *In re Brantiff Airways, Inc.*, 42 B.R. 443, 448 (Bankr.N. D.Tex.1984) (construing the Bankruptcy Code). Accordingly, a trustee's avoidance power under section 78fff–2(c)(3) of SIPA only comes into effect "[w]henever customer property is not sufficient to pay in full [certain creditor's claims]."

As noted above, it has already been determined in this case that April 8, 1985 is the date that will be used to determine the value of the customer fund for the purpose of determining whether there is insufficient customer property to pay all creditors' claims so as to allow the Trustee to exercise his avoidance power. In *Spencer I*, Spencer expressed concern that this date was unfair because changing future circumstances might render the fund sufficient to pay all claims. It is important to note at this juncture that Spencer's fears have not been realized.

The Trustee has filed status reports with the court which estimate that distributions from the Fund of Customer/Repo Property (the "Fund") to Pure Purchasers (as defined in the Intra–Inc. Settlement Agreement) will satisfy approximately 90% of Pure Purchaser claims. Each Pure Purchaser will suffer a loss approximately equal to ten percent of the amount of its claim. Spencer and Hawthorne, despite being among the class of Pure Purchasers have suffered no loss. Rather, they have reaped benefits in excess of 100 percent of their claims because they have received investment interest on the maturity proceeds of their Euro CDs.

It appears that in most cases, the 10 percent shortfall to Pure Purchasers will be satisfied by an advance previously distributed pursuant to SIPA. However, those creditors with extremely large potential claims, like Spencer, or those who are not entitled to an advance under SIPA, will suffer the full impact of the shortfall.[5] Moreover, the Trustee persuasively argues that even if Pure Purchasers were to receive 100 percent of their claims, Spencer and Hawthorne would still be in a better position than the others, since both Spencer and Hawthorne received investment interest on the money they received for their Euro CDs, while the other Pure Purchasers did not.

Nevertheless, Spencer and Hawthorne have retained accountants to analyze the fund of customer property and claims against the fund. Consequently summary judgment is not sought at this time on the "insufficient customer property" issue con-

---

**5.** Customers with extremely large claims will not be fully compensated because SIPA sets a maximum of $500,000 for advances. *See* 15 U.S.C. sec. 78fff–3(a).

tained in 15 U.S.C. sec. 78fff–2(c)(3) or the damages to which the Trustee is entitled.

*Avoidance under 11 U.S.C. sec. 549:*

Defendants contend that 15 U.S.C. 78fff–2(c)(3) only empowers the Trustee to avoid a transfer where such transfer is voidable under some section of the Bankruptcy Code, in this case section 549(a). Section 549 only authorizes avoidance of certain postpetition transfers *"of property of the estate."* Defendants contend that the transfers involved here are not property of the estate under the Bankruptcy Code and therefore are not voidable by the Trustee.

As support for their argument, defendants point to three classes of property excluded from "property of the estate" which limit the Trustee's avoidance power. In defendant's view, these three exceptions are:

> First ... property which the debtor holds as bailee. *See, e.g. Crouthamel Potato Chip Co.,* 6 B.R. 501, 507 (E.D.Pa.1980) ... Second, property ... in which the debtor holds a mere power which he can exercise solely for another or in which the debtor holds a legal, but not an equitable, interest *See e.g., In re Fidelity Standard Mortgage Corp.,* 36 B.R. 496 (B.S.D.Fla.1983) ... Third, property ... which the debtor, as a result of fraud or mistake, holds in constructive trust for another. *See, e.g., In re N.S. Garrot & Sons,* 772 F.2d 462 (8th Cir.1985) ...

Defendants' brief at 26. Defendants cite a plethora of cases which recognize these exceptions, especially those cases involving constructive trusts. It is most significant, however, that none of the cases cited by defendants concern securities transactions under SIPA.

Defendants rely heavily on section 541(b)(1) of the Bankruptcy Code and the doctrine of constructive trusts to argue that the Euro CDs held by Chase were not property of the estate under section 549. Defendants urge that BBS had no power over the Euro CDs other than to deliver instructions which BBS received from its customers concerning the CDs. Defendants further urge that BBS's limited power over the CDs places it squarely within section 541(b) which excludes from property of the estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor."

Defendants also argue that the definition of "property of the estate" contained in section 541(b) and (d) is a codification of the state law doctrine of constructive trust. It is defendants' position that because BBS falsely represented to Hawthorne and Spencer that their Euro CDs would be kept in separate safekeeping accounts expressly for them, and because defendants would not otherwise have entered into transactions with BBS absent these representations, the Euro CDs were being held by BBS in constructive trust for Hawthorne and Spencer. Defendants argue that the CDs are therefore not part of the property of the estate on which the Trustee can use his avoidance powers.

For the reasons stated below, I find that even assuming that Hawthorne and Spencer were the victims of the fraud and deception which they allege, and further assuming that BBS's conduct satisfies the exceptions to "property of the estate" under section 541(b) and (d) of the Bankruptcy Code, such circumstances do not provide a viable defense to the Trustee's avoidance action under SIPA.

■ While defendants' argument is partly correct with respect to actions by a bankruptcy trustee who proceeds solely under the Bankruptcy Code, it is fatally flawed with respect to the matter at hand, in which the Trustee is administering a liquidation under SIPA. Defendants' present argument is in some respects merely a revamped version of previous arguments which have been rejected by this court. Defendants correctly argue that section 78fff–2(c)(3) expressly requires a transfer to be voidable under the the Bankruptcy Code, however, that section also contains an important exception to this requirement. As previously decided in *Spencer I,* the last sentence of section 78fff–2(c)(3) creates a legal fiction which treats securities as if they were owned by the debtor prior to transfer; and, if the transfer was for the benefit of the custom-

er, treats the customer as if it were a creditor. *Spencer I*, 83 B.R. at 894. This fiction relieves the Trustee from having to prove (as he might have to if proceeding solely under section 549) that the securities in question are property of the estate. The Trustee need only prove that the property in question was "customer property" as defined by SIPA. Defendants nonetheless ignore the effect of this provision for the second time.

■ As noted in *Spencer I*, the purpose of SIPA is sufficiently clear and it contradicts defendants' argument here. The Trustee's power to avoid postpetition transfers is defined by 15 U.S.C. sec. 78fff–2(c)(3), which provides:

Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. *For purposes of such recovery, the property so transferred shall be deemed to be the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any state to the contrary notwithstanding.*

Customer property under SIPA is defined as "cash and securities . . . at any time received, acquired or held by or for the account of the debtor from or for the securities account of a customer." 15 U.S.C. sec. 78*lll* (4). This court has already determined that if the Euro CDs had not been transferred to Hawthorne and Spencer, they would have been included in the fund of customer property available for *pro*

*rata* distribution to all customers of BBS. *Spencer I*, 83 B.R. at 894. Thus, the Trustee has already satisfied the primary requirement of 78fff–2(c)(3).

Equally as important here is the fact that the Euro CDs are considered the "debtor's property" because of the fiction created by section 78fff–2(c)(3).[6] As noted in *Spencer I*, "'[t]he purpose of these fictions is to enable the trustee to fit the transaction into the provisions of the avoidance sections of the Code.'" *Spencer I*, 83 B.R. at 894 (citing 4 Collier on Bankruptcy, par. 749.02[2], p. 749–3 (15th ed. 1987) (explaining the purpose of section 749(a) of the Bankruptcy Code, which controls stockbroker liquidations not governed by SIPA)). Absent these fictions, virtually all securities transactions would be immune from the trustee's avoidance power, frustrating SIPA's purpose of equitable distribution. More specifically, section 78fff–2(c)(3) clearly makes securities like the Euro CDs at issue here "debtor's property" and there is no basis for further requiring the Trustee to prove that property which is both "debtor's property" and "customer property" under SIPA is also "property of the estate" as referred to in section 549 and defined in the Bankruptcy Code. If defendants' position was adopted it would render the fiction created by the last sentence of section 78fff–2(c)(3) meaningless, defeating its very purpose.

Defendants' position would frustrate the central purpose of section 78fff–2(c)(3) which is to permit the SIPA trustee to "recover any property transferred by the debtor which except for such transfer, would have been customer property" as defined by SIPA. Since the Euro CDs in this case would have been customer property, the Trustee should be permitted to avoid them. This result is in keeping with

---

**6.** As discussed in *Spencer I*, 83 B.R. at 894: This fiction allows the SIPA trustee to avoid post petition transfers in spite of the fact that a broker-dealer liquidation technically does not involve the debtor creditor relationship referred to in section 549 of the Bankruptcy Code. For example section 549(a) allows a bankruptcy trustee to 'avoid a transfer of property of the estate . . ." Utilizing the fic-

tion in 15 U.S.C. sec. 78fff–2(c)(3), "property of the estate is deemed to mean "customer property" in determining whether a transfer is voidable by as SIPA trustee. The fiction prevents a customer from using a technical reading of section 549 to retain securities that would otherwise be recoverable by the SIPA trustee.

the equitable distribution which is contemplated by the liquidation process under SIPA. *See Spencer I*, 83 B.R. 893–94 (discussing the liquidation process under SIPA); *First Federal Savings & Loan Association v. Bevill, Bresler & Schulman Inc.*, 59 B.R. 353, 364 (D.N.J.1986). The Trustee correctly notes that even if the facts of this case satisfied the requirements of the doctrine of constructive trust as defendants contend, such state law doctrine must give way to the policy of SIPA because to do otherwise would frustrate SIPA's purpose. *See Chicago Board of Trade v. Johnson*, 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924) (under the Supremacy Clause of the U.S. Constitution, inconsistent state laws must give way to a federal statute); *Butner v. United States*, 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 918 n. 9, 59 L.Ed.2d 136 (1979) (discussing preemption in the context of bankruptcy).

*Transfer by the Debtor:*

■ In another effort to thwart the Trustee's avoidance power, defendants argue that contrary to the requirements of section 78fff–2(c)(3) of SIPA, the transfer of the Euro CDs from the BBS account at Chase was not a transfer by the debtor. However, it is undisputed that the account at Chase was opened by BBS and the CDs were transferred from Chase at the direction of BBS through a coded telex. It is also undisputed that only BBS and Chase knew the code for such telex. Thus, it is apparent that the transfer was by the debtor, BBS, for the purposes of section 78fff–2(c)(3). Any other holding under these circumstances would emasculate that section of SIPA.

*Whether the Transfers of Euro CDs Were in the Normal Course of Business or Otherwise Authorized by the Bankruptcy Code:*

■ In another attempt to defeat summary judgment, defendants argue that the Euro CD transfers are not voidable under section 549 because the transfers were specifically authorized under the Bankruptcy Code and were made in the ordinary course of business of BBS.

To recover under section 549, the Trustee can recover property if the transfer at issue was made after the commencement of the case and such transfer was either authorized only under section 303(f) or 542(c), or was not authorized by the Bankruptcy Code or by the court.[7] In this case, the Trustee has satisfied the requirement of section 549(a)(1) since the date of commencement of the case has already been determined to be April 8, 1985. Having satisfied this requirement, the Trustee relies primarily on section 549(a)(2)(B) of the Code, claiming that the transfers of the Euro CDs were not authorized by the Bankruptcy Code or the court. The defendants bear the burden of proof as to the validity of the transfers. Bankruptcy Rule 6001.

Defendants argue that the transfers in question were authorized under 11 U.S.C. sections 1107 and 1108. With certain limitations, section 1107 gives the debtor in possession "all the rights ... and powers" of a Chapter 11 trustee. In addition, section 1108 states: "[u]nless the court orders otherwise, the trustee may operate the debtor's business." Based on these provisions, defendants argue that BBS, as a debtor in possession at the time of the Euro CD transfers, had the power to conduct its normal course of business which included transferring the CDs to defendants' banks. This power was derived from section 363(c) of the Bankruptcy Code which allows the trustee (and therefore the debtor in possession) to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of

7. Section 549(a) of the Bankruptcy Code provides as follows:

Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and

(2)(A) that is authorized under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.

11 U.S.C. sec. 549(a).

business, without notice or a hearing." 11 U.S.C. sec. 363(c).

This argument by defendants is flawed for the simple reason that BBS, which was in the business of trading securities, cannot be a debtor under Chapter 11 of the Bankruptcy Code. Section 109(d) provides: "[o]nly a person that may be a debtor under chapter 7 of this title, *except a stock broker or a commodity broker*, and a railroad may be a debtor under chapter 11 of this title." 11 U.S.C. sec. 109 (emphasis added). For this reason, defendants cannot rely on the powers conferred on debtors in possession under Chapter 11.

■ Defendants' next argument concerns set-offs under the Bankruptcy Code. Defendants contend that the transfers of the Euro CDs were authorized by the automatic stay provisions of 11 U.S.C. sec. 362(b)(6) which provides, in part:

> (b) The filing of a petition under section 301, 302 or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), does not operate as a stay—
> (6) under subsection (a)(2) of this section, of the setoff by a ... stockbroker, financial institution, or securities clearing agency of *any mutual debt and claim* under or in connection with ... securities contracts, as defined in section 741(7) of this title, ... that constitutes the setoff of a claim against the debtor ... or settlement payment, as defined in section 741(8) of this title, arising out of ... securities contracts against cash, securities or other property held by or due from such ... stockbroker, financial institution, or securities clearing agency to margin, guarantee, secure or settle ... securities contracts.

(emphasis added).

Again, there are serious flaws in defendants' argument. First, section 362(b)(6) deals solely with an automatic stay, setting forth the guidelines for determining which actions and transactions by the debtor are subject to such a stay. The instant controversy does not involve the scope or application of an automatic stay; thus, defendants' reliance on section 362(b)(6) is misplaced. However, even if that section was applied here, it would not support defendants' position.

■ Section 362(b)(6) expressly states that it concerns "any mutual debt and claim." This case involves Euro CDs paid for by defendants, and which were being held by BBS through Chase for defendants' benefit. Defendants paid BBS for its services when it paid for the CDs. There was therefore no mutual debt because defendants had claims against BBS for the Euro CDs they purchased, but BBS had no claims against the defendants.

■ Defendants rely on section 546(e) in another attempt to demonstrate that the transfers of Euro CDs were authorized by the Bankruptcy Code. That section provides that "the trustee may not avoid a transfer that is ... a settlement payment, as defined in section 741(8) ... made by a stockbroker ... *that is made before the commencement of the case.*" 11 U.S.C. sec. 546(e) (emphasis added). Settlement payment is defined as follows:

> ... a preliminary settlement payment, a partial settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. sec. 741(8). These provisions are clearly not applicable to the present case. Section 546(e) does not deal with the circumstances envisioned by section 549 which are present in this case, namely circumstances involving settlements or other transfers which occur after the commencement of the case. Moreover, even if section 546(e) was applicable here, the delivery of the Euro CDs from the BBS account at Chase to the respective accounts of defendants was not a settlement within the meaning of the code. In this regard, the discussion of settlements concerning repurchase agreement transactions in *Saul Cohen, Trustee v. Spencer Savings & Loan Association,* Civ. No. 87–1154 (transcript opinion of October 11, 1988) applies equally to

the present discussion with respect to Euro CDs. *See Id.* at pp. 40–42.

In the October 11 opinion it was noted:

The term "settlement" has a well recognized meaning in the securities industry. As stated in the New York Stock Exchange's *The Language of Investing Glossary* (1981) at page 30, "settlement" is the

[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale.

Trades customarily settle within five business days of being executed:

On settlement day, which is normally five days after a trade is executed, the seller's broker is supposed to deliver the bonds or stock certificates to the buyer's broker. If delivery is not made on time the first broker has a "fail-to-deliver" item. It should be noted that fails occur only between brokers—the failure of the selling customer to hand over to his broker the stock which he sold is not classified as a fail-to-deliver.

N. Wilson, Philips and T. Russo, *Regulation of Brokers, Dealers and Securities Markets* (1977), at pages 6–13, not 28. With respect to the Euro CD transactions at issue in the present case, the "settlement" occurred once the defendant paid for the CDs and they were deposited into the BBS account at Chase where they were held for some time for the defendants' benefit. The subsequent transfer after bankruptcy proceedings were commenced from Chase to the defendants' respective bank accounts was not part of this settlement process. Thus, even if section 546(e) was applicable here, it would not provide authorization for the transfers at issue.

■ Relying on *In re Dant v. Russel, Inc.*, 853 F.2d 700 (9th Cir.1988) defendants argue that the transfers of the Euro CDs were in the ordinary course of business and therefore authorized by the Bankruptcy Code. *Dant* involved a debtor-in-possession under Chapter 11 which had entered into a post-petition lease for a job site.[8] The lessor sought to enforce a claim under the lease arguing that the lease was valid because it was executed in the normal course of business. The Ninth Circuit agreed with the lessor, applying a "horizontal dimension test", holding that the lease was executed in the ordinary course of business under 11 U.S.C. sec. 363. *Id.* at 704.[9] The test was described as "involving an industry-wide perspective in which the debtor's business is compared to other like business." *Id.* The Court noted that the transaction in question must not be an abnormal act to gain advantage over other creditors, but the transaction need not be common; it need only be ordinary. *Id.*

The *Dant* Court also discussed the "vertical dimension or creditor's expectation test" as an alternative test for determining the ordinary course of business. That test inquires " 'whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.' " *Id.* at 705 quoting *In re Johns Manville Corp.*, 60 B.R.

---

**8.** The debtor in *Dant* continued to operate its wood treatment plant after filing a voluntary bankruptcy petition. While the bankruptcy proceedings were pending, the debtor, without court approval, entered into a new 5–year lease extending a prior lease for one of its work sites. The lease contained a promise by the debtor "to restore the premises to a condition satisfactory to the lessor." *Id.* at 702. The Oregon Department of Environmental Quality ("DEQ") subsequently found that the site was rife with hazardous toxic waste. After the debtor failed to respond to DEQ's requests for on-site investigations, the lessor spent $250,000 in an attempt to clean up some of the waste. The lessor later filed a claim with the bankruptcy court requesting an administrative expense priority for the cleanup costs of the site. *Id.* at 703. The total cleanup costs for the site was estimated at $20–30 million, far exceeding the debtor-in-possession's unencumbered assets. *Id.* at 702–03.

**9.** As support for its holding, the *Dant* Court found that: the debtor had operated the work site for 11 years following its execution of leases with the lessor; renewal leases had been executed in the past; the debtor operated on both its own land and the leased site; and the debtor's predecessors executed similar leases, operating in substantially the same manner since 1958. *Dant*, 853 F.2d at 704–05.

612, 616 (Bankr.S.D.N.Y.1986), *rev'd. on other grounds,* 801 F.2d 60 (2d Cir.1986).

Contrary to defendants' argument, *Dant* and the tests discussed therein are inapplicable to the present case because they are derived from the provisions of Chapter 11 which, as discussed above, simply do not apply to BBS. However, even if these exceptions were to apply there is little indication in the record thus far to show that the last minute transfers of the Euro CDs out of the BBS account at Chase were in keeping with industry-wide practices. On the contrary, it appears that the transfers may very well have been of the "abnormal" type noted in *Dant,* used to gain an unfair advantage over other creditors.

*Perfection of Security Interests:*

■ Defendants contend that the Euro CD transfers were merely acts to perfect defendants' respective security interests in the CDs and therefore authorized under 11 U.S.C. sec. 546(b). That section provides, in part:

> The rights and powers of a trustee under sections 544, 545 and 549 ... are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

11 U.S.C. sec. 546(b). *See e.g., Maryland National Bank v. Mayor and City Council of Baltimore,* 723 F.2d 1138, 1141–42 (4th Cir.1983) (upholding the validity of a postpetition real estate tax lien under sec. 546(b) because imposition of the lien was the last step in the perfection process under Maryland law); *In re Yobe Electric Inc.,* 728 F.2d 207 (3d Cir.1984) (creditor's postpetition filing of a notice of intention to file a mechanic's lien did not violate automatic stay provision of 11 U.S.C. sec. 362

because Pennsylvania law allowed the notice to relate back to a time prior to debtor's bankruptcy).

Section 546(b) cannot be correctly applied to this case. As the court noted in *Matter of Valairco, Inc.,* 9 B.R. 289, 293 (Bankr.D.N.J.1981), *aff'd in part,* Civ. No. 81–866 (D.N.J. June 1, 1981) (unpublished), the legislative history of section 546(b) "clearly indicates that its purpose is not to permit a creditor, who itself has taken no action prior to the filing of the case, to perfect a lien subsequent to the filing of the case." Rather, the legislative history demonstrates that the section is meant to allow a creditor to defeat an avoidance action where "applicable law" permits the creditor to perfect its lien against an intervening interest holder and under such law, perfection "relates back to a date that is before the commencement of the case." House Report 95–595, 95th Cong., 1st Sess. 371 (1977), *reprinted in* [1978] *U.S.Code Cong. & Admin.News,* 5787, 5963, 6327.

The defendants in this case fail to show any "applicable law" which would permit them to perfect in the manner envisioned by section 546(b). They point to English law only as support for the proposition that they had the right to take possession of the Euro CDs. They do not claim that English law also provides a right to perfect which would relate back to before the commencement of the case. Moreover, even if English law provided such a right it is not clear that it would apply here.

Defendants also rely on New Jersey law with respect to perfecting a security interest, stating:

> this court has held that under New Jersey law, if New Jersey law is applicable to this issue, delivery to a purchaser of securities is completed under N.J.U.C.C. sec. 8–313(1)(c) where (1) the broker sends confirmation of the purchase; (2) the broker identifies the security as belonging to the purchaser; and (3) the security is in a safekeeping account maintained by the broker. *Test Case Decision,* 67 B.R. [557] at 606 [1986].

Defendants' brief at 48. However, that discussion of New Jersey law concerned

the repurchase agreements of the BBS Asset Management Corporation under the Bankruptcy Code. It did not involve SIPA and the fictions of section 78fff–2(c)(3) which are, as discussed earlier, in some respects different from the Bankruptcy Code. More importantly, defendants have not demonstrated that this law of New Jersey or any other applicable law allows them to perfect against an intervening interest holder with such perfection relating back to a date prior to the commencement of the case.

■ Instead, the defendants rely on "compelling policy reasons" for thwarting the Trustee's avoidance action. They argue that if purchasers of Euro CDs were required to maintain their own individual safekeeping accounts in London to ensure their undisputed rights to such CDs, American savings and loan institutions ("S & Ls"), who presently benefit from London trades, would be severely harmed. As support for this contention, defendants rely on the following affidavits.

Brian Dittenhafer, the President of Federal Home Loan Bank of New York, states that a requirement that each S & L must maintain its own London safekeeping account would effectively bar S & L's "from taking advantage of what would otherwise be a useful resource." Dittenhafer affidavit at 3. Another expert, Rodger D. Shay states that such a requirement:

> ... would have a very deleterious impact upon the investment income of S & L's. These associations have, to some extent, been unable to enhance their financial stability by purchasing Euro CDs with their higher yield. If each S & L must open its own safekeeping account with a London bank in order to safely purchase Euro CD's, I am confident that the result will be that most S & L's will forego the higher yield and invest only in domestic CDs.

Shay affidavit at 4.

Even if the policy cited by defendants could override the clear congressional purpose expressed in SIPA, defendants argument is still unpersuasive because there is simply no objective data to support the conclusory statements offered by defendants' experts. For instance, there is no evidence of the costs of opening a London safekeeping account, nor is there evidence of the financial impact of such costs on S & L's. It is also most curious that despite what defendants describe as an onerous burden, Hawthorne maintained its own London safekeeping account in which it deposited the Euro CDs from its first transaction with BBS. It is similarly curious that with respect to the second two transactions with BBS, Hawthorne, apparently unaffected by cost considerations, understood that it was to execute documents with Chase for the purpose of setting up its own safekeeping account there. Herbst affidavit at pars. 10–11. It is also noteworthy that the cost of setting up an individual safekeeping account was not so burdensome as to deter either defendant from setting up such an account when it became concerned about its investments with BBS.

*Customer Name Securities:*

■ Defendants argue that the Euro CD transfers cannot be voided because the CDs were customer name securities under 15 U.S.C. sec. 78*lll*(3) which defines such securities as:

> ... securities which were held for the account of a customer on the filing date by or on behalf of the debtor and which on the filing date were registered in the name of the customer, or were in the process of being so registered pursuant to instructions from the debtor, but does not include securities registered in the name of the customer which, by endorsement or otherwise, were in negotiable form.

With respect to Euro CDs, defendants have demonstrated that they cannot be registered in a customer's name, thus the requirement of this section cannot be met. Nonetheless, defendants argue that the policy behind the provisions exempting customer name securities requires that the Euro CDs be considered as customer name securities. Defendants argue that since they took all possible steps to prevent the unauthorized transfer of their Euro CDs, leaving BBS only the ability to misappropri-

ate the CDs by "aggravated misconduct" and since the constraints which English law places on Euro CDs prevent such CDs from being freely negotiable by American legal standards, the CDs should be deemed customer name securities in keeping with this court's decision in *Matter of Bevill, Bresler & Schulman, Inc.*, 59 B.R. 353, 361 (D.N.J. 1986) ("Lincoln Savings").

While defendants' argument here has some appeal to it, it is nonetheless unpersuasive. There may be some restrictions on the transferability of Euro CDs, but defendants failed to take all of the steps necessary to ensure the safety of their CDs. They failed to do what Hawthorne had done in its first transaction with BBS, that is to place the CDs in their own safekeeping account to ensure their safety. While Hawthorne and Spencer are certainly in unfortunate circumstances with respect to their Euro CDs, they are in no different position from that of the numerous other creditors of BBS who were defrauded in various ways. In this instance, Hawthorne and Spencer were misled by BBS into believing that their CDs would be held in individual safekeeping accounts, when, in fact, they were not. While there are certain circumstances which make this case somewhat different from the cases of other creditors, there are inadequate differences to justify singling out two creditors from the mass of unfortunate former customers of BBS.

### CONCLUSION

For the foregoing reasons, the Trustee's motion for partial summary judgment will be granted.