**Michael T. TREFNY, Co–Trustee of MBM Investment Corporation, Plaintiff/Appellee,**

v.

**BEAR STEARNS SECURITIES CORP. and Bear Stearns & Co., Inc., Defendants/Appellants.**

No. Civ.A. H–98–3836.

United States District Court, S.D. Texas, Houston Division.

May 26, 1999.

Bryan W. Scott, Attorney at Law, Houston, TX, for MBM Investment Corporation, debtor.

Gerard G. Pecht, Fulbright and Jaworski, Houston, TX, for Bear Stearns & Co, Bear Stearns Securities Corp., appellants.

Bryan W. Scott, Attorney at Law, Houston, TX, for Michael T. Trefny, co-trustee of MBM Investment Corp., appellee.

## MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

This case raises issues of the relationship between the Federal Arbitration Act (FAA) and the Securities Investor Protection Act (SIPA). Michael Trefny is a co-

trustee appointed under the SIPA to preside over the liquidation of a brokerage firm, MBM Investment Corporation. Trefny sued Bear Stearns Securities Corp. and Bear Stearns & Co., Inc. (collectively "Bear Stearns") in an adversary proceeding in the bankruptcy court. Bear Stearns moved in the bankruptcy court to dismiss or stay the adversary proceeding in favor of written arbitration agreements. The arbitration agreements are contained in two types of contracts: a contract between Bear Stearns and MBM, under which Bear Stearns performed clearing services for MBM; and contracts between MBM customers and Bear Stearns, signed when the MBM customers opened accounts at Bear Stearns.

On October 9, 1998, the bankruptcy court denied Bear Stearns' motion to dismiss or stay pending arbitration. Bear Stearns appealed from that denial. Bear Stearns also appealed from the bankruptcy court's refusal to stay the adversary proceeding pending the resolution of this appeal.

On March 29, 1999, Bear Stearns filed an expedited motion to stay the bankruptcy proceeding pending appeal, triggered by the bankruptcy judge's order compelling Bear Stearns to produce documents in discovery. (Docket Entry No. 10). This court held an oral hearing on the expedited motion to stay pending appeal and on the merits of the appeal on April 5, 1999. Based on the motion and response, the arguments of counsel, the record, and the applicable law, this court GRANTED Bear Stearns' motion to stay pending the resolution of this appeal. In this opinion, this court sets out the reasons for its finding that Bear Stearns met the requirements for a stay.

On April 21, 1999, Trefny filed an expedited motion to abate this appeal and transfer it to another district judge in this division, the judge who had initially referred the SIPA trustee's claims against MBM to the bankruptcy court. Trefny filed this motion after that district judge denied Bear Stearns' motion to withdraw the reference. This court DENIES Trefny's motion to abate or transfer.

Finally, for the reasons set out in detail below, this court decides the merits of the appeal and GRANTS Bear Stearns' motion to stay in order to permit the resolution of the dispute in arbitration.

## I. The Procedural and Factual Background

MBM was a brokerage firm located in Houston, Texas. Juan Carlos Martinez owned thirty-five percent of the stock and served as president. On November 9, 1992, MBM entered into an Agreement for Securities Clearance Services (the "Clearing Agreement") with Bear Stearns. Under the Clearing Agreement, Bear Stearns agreed to act as the clearing broker for MBM's customers. As clearing broker, Bear Stearns agreed to execute trades ordered by MBM on behalf of MBM's customers, clear the trades on national exchanges, and send trade confirmations and account statements to MBM and its customers.

The Clearing Agreement between MBM and Bear Stearns contained the following broad arbitration clause:

> 26(b). All disputes and controversies relating to or in any way arising out of this Agreement shall be settled by arbitration before and under the rules and auspices of the New York Stock Exchange, Inc., unless the transaction which gives rise to such dispute or controversy is effected in another United States market which provides arbitration facilities, in which case it shall be settled by arbitration under such facilities.

(No. H–98–3432, Docket Entry No. 7, Motion to Dismiss, ¶ 26).

In order to have Bear Stearns execute MBM's orders for MBM's customers, those customers opened accounts with Bear Stearns. Each of the MBM customers who opened a Bear Stearns account

executed a written customer agreement containing, in bold type, the following broad arbitration clause:

21. *ARBITRATION.*

- ARBITRATION IS FINAL AND BINDING ON THE PARTIES.
- THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL

\* \* \* \* \* \*

YOU AGREE, AND BY MAINTAINING AN ACCOUNT FOR YOU BEAR STEARNS AGREES, THAT CONTROVERSIES ARISING BETWEEN YOU AND BEAR STEARNS, ITS CONTROL PERSONS, PREDECESSORS, SUBSIDIARIES AND AFFILIATES ..., WHETHER ARISING PRIOR TO, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION.

\* \* \* \* \* \*

THE AWARD OF THE ARBITRATORS, OR THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

(No. H–98–3234, Docket Entry No. 7, Motion to Dismiss, ¶ 21). The Customer Agreements stated that the customer agreed that the "arbitration provision ... shall be applicable to all matters between or among any of you, your broker [MBM] and its employees, and Bear Stearns and its employees." *Id.*

The relationship between MBM, as an introducing broker, and Bear Stearns, as the clearing firm, is described in the Clearing Agreement and in the customer agreements. The relationship was fully disclosed: MBM, the introducing broker, disclosed its customers' names and addresses to Bear Stearns, the clearing firm, and those customers opened accounts with Bear Stearns to enable it, among other things, to execute trades and to prepare and furnish trade confirmations and monthly statements of account to the customer.

The customer agreements specifically stated that as clearing broker for the customer's broker, MBM, Bear Stearns would accept orders from MBM to purchase or sell securities or other property in the customers' accounts "without any inquiry or investigation." (No. H–98–3234, Docket Entry No. 7, Motion to Dismiss, Ex. 2, ¶ 8). The Clearing Agreement between Bear Stearns and MBM stated that "Bear Stearns Securities shall limit its services pursuant to the terms of this Agreement to that of clearing functions and the related services expressly set forth herein. Neither this Agreement nor any operation hereunder shall create a general or limited partnership, association or joint venture or agency relationship between you and Bear Stearns Securities." (No. 98–3234, Docket Entry No. 7, Motion to Dismiss, Ex. 1, ¶ 21(a)).

In 1996, MBM became insolvent. A number of government agencies investigated numerous customer complaints, including complaints that MBM employees or officers had taken money from customers. One of MBM's officers is serving a jail sentence for his criminal involvement in the MBM customer accounts. (Docket Entry No. 2, p. 6; No. 98–3234, Docket Entry No. 18, Reply in Support of Motion to Dismiss, Ex. A, Affidavit of Special Agent Vanessa Walther).

On June 3, 1996, the Securities Investor Protection Corporation ("SIPC") sued MBM in the federal district court in the Southern District of Texas. (No. H–96–1765). Judge Gilmore appointed a trustee to oversee the liquidation of MBM and referred the liquidation to the bankruptcy court.

The SIPC advanced funds to the trustee to pay customer claims under the terms of the SIPA. Using these funds, the trustee paid $9.8 million to MBM customers whose claims the trustee had determined to be

valid. (No. H–98–3234, Docket Entry No. 46, Second Amended Complaint, ¶ 6). These customers assigned their claims to the SIPA trustee up to the amount of the SIPC payments they received.

On March 12, 1998, the bankruptcy judge appointed Trefny as co-trustee. On April 29, 1998, Trefny filed an adversary proceeding against Bear Stearns in the bankruptcy court. In the adversary proceeding, Trefny alleged that Martinez, the president of MBM, had made unauthorized trades and transfers of money from his customers' accounts into financial accounts that Martinez owned or controlled. (No. H–98–3234, Docket Entry No. 46, Second Amended Complaint, ¶ 9). Trefny alleged that the improper transactions primarily involved $10 million worth of "Mannai Bonds," three-year notes issued by the Mannai Retail Group and by a Swiss brokerage house to finance shopping centers in Moscow. Trefny alleged that these bonds were worth far less than their face value and were unmarketable. Trefny alleged that MBM made unauthorized purchases of Mannai Bonds for its customers and that Bear Stearns executed the transactions, including selling securities in the customers' accounts in order to pay for the Mannai Bonds.

In the adversary proceeding, Trefny alleged that Bear Stearns is liable for the fraud committed by MBM and its employees and officers, as well as for Bear Stearns' own alleged misconduct. Trefny alleged different bases for Bear Stearns' liability. Trefny alleged "on information and belief" that Bear Stearns had paid for the Mannai Bonds purchased for MBM's account and therefore had an interest in placing the bonds "as quickly as possible, and pressure was put on employees of MBM to place them legally or not." (No. H–98–3234, Docket Entry No. 46, Second Amended Complaint, ¶ 10). Trefny alleged that MBM "and/or" Bear Stearns attempted to conceal the unauthorized trades and transfers by issuing false customer account statements or by sending the statements to wrong addresses. "Bear Stearns must have known that some of the customer statements were going to MBM and not to the customers." (Id., ¶ 12). Trefny asserted that Bear Stearns violated federal securities regulations by purchasing newly issued stocks or bonds for MBM customers based on unmarginable stocks and by selling securities in MBM customers' accounts to buy the newly issued bonds. (Id., ¶ 13). "Bear Stearns, as clearing agent for MBM, acted recklessly in failing to discover the fraudulent practices of MBM." (Id., ¶ 14).

In the adversary proceeding, Trefny alleged causes of action against Bear Stearns under Texas state law for conversion, common law fraud, Texas Securities Act violations, statutory fraud, DTPA violations, and civil conspiracy. Trefny also alleged federal civil causes of action for damages based on violations of federal criminal statutes, including federal wire fraud and federal fraudulent interstate transactions. Trefny did not allege violations of the federal securities laws. Initially, Trefny alleged no claims under the Bankruptcy Code. In a first amended complaint, Trefny alleged a claim for turnover under 11 U.S.C. § 542. After Bear Stearns filed a motion to dismiss or stay pending arbitration, Trefny filed a second amended complaint, adding a claim for fraudulent transfer under section 548 of the Bankruptcy Code.

Two of MBM's customers who received SIPC funds and assigned their claims to Trefny up to the amount of the funds they received also sued Bear Stearns to pursue the claims they retained. One of those customers, Interdrill, filed an adversary proceeding in the bankruptcy court against Bear Stearns and the trustee. Interdrill later voluntarily dismissed the trustee as a defendant and the federal district court withdrew the reference. In the district court, Bear Stearns filed another motion to dismiss or stay pending arbitration. Interdrill alleged a number of state and federal causes of action against Bear Stearns

based on the same transactions and bonds at issue in this bankruptcy appeal. The federal district court dismissed all Interdrill's claims against Bear Stearns for failure to state a cause of action, except the state law fraud claim. The court granted Bear Stearns' motion to dismiss that claim, based on the arbitration provision in the customer agreement between Interdrill and Bear Stearns.[1] That arbitration provision is identical to the provision in the customer agreements between Bear Stearns and the MBM customers at issue in this case. The claims Trefny asserts in this case include the claim that Interdrill assigned to Trefny.

One other MBM customer, Joaquin Lamuno Otaolaurruchi, also sued Bear Stearns in federal district court, based on the same securities at issue here. In that case, Bear Stearns also moved for a dismissal or stay pending arbitration, based on the same arbitration agreement. The district court granted Bear Stearns' motion to dismiss in favor of arbitration.[2] The district court dismissed the customer's damages claims for violations of the criminal statutes governing theft, wire fraud, and fraudulent interstate transportation, on the basis that private persons and entities cannot assert claims under federal and state criminal statutes. Only one claim, for civil conspiracy, remained. The court found this claim covered by the arbitration provision in the customer agreement with Bear Stearns.

Trefny continued to pursue the adversary proceeding against Bear Stearns in the bankruptcy court. On June 15, 1998, Bear Stearns filed a motion to dismiss or, in the alternative, to stay the adversary proceeding, based on the arbitration agreements. On June 25, 1998, Bear Stearns filed a motion to stay discovery pending the bankruptcy court's decision on the motion to dismiss. On October 9,

1998, the bankruptcy judge entered two orders: an order denying Bear Stearns' motion to stay discovery and an "Order of Dismissal" denying Bear Stearns' motion to dismiss. (No. H–98–3234, Docket Entry Nos. 39 & 40).

Bear Stearns appealed both decisions under separate notices of appeal. This court was assigned the appeal from the bankruptcy court's order denying the motion to dismiss in favor of arbitration. The appeal from the bankruptcy court's order denying a stay of discovery was assigned to a different district judge in this district.

· On October 30, 1998, Bear Stearns filed a motion in the bankruptcy court under Rule 8005 to stay proceedings in that court, pending the resolution in this court of the appeal from the refusal to enforce the arbitration agreements. After filing the Rule 8005 motion, and with the agreement of the co-trustee, Bear Stearns dismissed its separate appeal from the bankruptcy court's denial of the motion to stay discovery. Bear Stearns asserts that its voluntary, joint dismissal was "because the Rule 8005 motion was the more judicially efficient avenue to stay discovery pending appeal." (No. H–98–3234, Docket Entry No. 84, p. 2). The bankruptcy court denied the Rule 8005 motion on November 6, 1998; vacated that order three days later; then, on March 25, 1999, granted Trefny's motion to compel document production. (No. H–98–3234, Docket Entry Nos. 59, 60, and 85). Bear Stearns asserts that by granting Trefny's motion to compel, "the bankruptcy court has effectively denied Bear Stearns' Motion to Stay Proceedings Pending Appeal." (Docket Entry No. 10, p. 3).

Before this court, Bear Stearns appeals the bankruptcy court's refusal to dismiss or stay the adversary proceeding Trefny filed. Bear Stearns argues that the arbi-

1. *Interdrill Inc. v. Bear Stearns Securities Corp. and Bear Stearns & Co.,* No. H–98–3597 (1998) (Docket Entry No. 55, Jan. 29, 1999).

2. *Joaquin Lamuno Otaolaurruchi, et al. v. Bear Stearns Securities Corp. and Bear Stearns*

*& Co.,* No. H–98–3591 (1998) (Docket Entry No. 42, April 20, 1999).

tration clauses in the agreement between MBM and Bear Stearns and in the agreements among Bear Stearns and MBM's customers apply. On March 29, 1999, Bear Stearns filed an expedited motion under Rule 8005 to stay pending the appeal in this court. (Docket Entry No. 10). Bear Stearns argues that "several deadlines imposed by the bankruptcy court in a Scheduling Order are approaching. Accordingly, pursuant to Rule 8005, Bear Stearns has no recourse but to urge its Motion to Stay Proceedings Pending Appeal to this Court." (*Id.*, p. 3).

Trefny challenges the motion to stay the adversary proceeding in the bankruptcy court pending the appeal and challenges the merits of the appeal. As to the motion to stay pending appeal, Trefny asserts a number of procedural challenges, including lack of ripeness and waiver. As to the merits of the appeal from the denial of the motion to dismiss or stay pending arbitration, Trefny asserts that because he did not agree to arbitrate these disputes, Trefny is not bound by the arbitration provisions in the Bear Stearns Clearing Agreement executed by MBM or by the arbitration provisions in the Bear Stearns customer agreements executed by the MBM customers. Trefny also asserts that because he is asserting claims under the SIPA and under the Bankruptcy Code, he is not subject to arbitration under the FAA. Bear Stearns has filed responses; both the motion to stay pending appeal and the motion to dismiss (or stay) pending arbitration are fully briefed.

On April 21, 1999, Trefny filed in this court an expedited motion to abate and transfer this case to the district court that originally referred the SIPC's action against MBM to the bankruptcy court. (Docket Entry No. 16). Trefny filed the expedited motion after that district court denied Bear Stearns' motion to withdraw the reference to the bankruptcy court. Bear Stearns had filed that motion on June 15, 1998. The district court found that mandatory withdrawal did not apply because Trefny had not alleged cognizable causes of action involving "other laws of the United States regulating organizations or activities affecting interstate commerce." The court found that because Trefny had pleaded two "core" causes of action under the Bankruptcy Code, a section 542 claim for turnover, and a section 548 claim for fraudulent transfer, as well as causes of action under state law, the court would not withdraw the reference. (No. 98–1765, Docket Entry No. 11, p. 6). The district court did not analyze whether the claims should be submitted to arbitration under the arbitration agreements.

In the expedited motion to abate and transfer, Trefny argues that the district judge who initially referred the case to the bankruptcy court has exclusive jurisdiction by virtue of 15 U.S.C. § 78eee(b)(2)(A). Trefny argues that this court should transfer this appeal to that court "as a matter of judicial administration." (Docket Entry No. 16, p. 3).

Trefny's motion to transfer or abate, and Bear Stearns' motions to stay pending appeal and to dismiss or stay to permit arbitration, are examined below.

## II. The Standard of Review

 In reviewing a bankruptcy court decision, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal. *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir.1992). This court will not set aside a bankruptcy court's findings of fact unless they are clearly erroneous. FED.R.BANKR.P. 8013; *In re McDaniel*, 70 F.3d 841, 842–43 (5th Cir. 1995). A finding of fact is clearly erroneous if, after review of all the evidence, the court is left with a firm and definite conviction that the bankruptcy court erred. *In re McDaniel*, 70 F.3d at 843. This court reviews legal conclusions *de novo*. *Id.*; *In re Herby's Foods, Inc.*, 2 F.3d 128, 130 (5th Cir.1993).

## III. The Procedural Issues

### A. The Rule 8005 Motion to Stay the Bankruptcy Proceedings Pending this Appeal

Pending this court's resolution of the merits of Bear Stearns' appeal, Bear Stearns moved under Bankruptcy Rule 8005 for a stay of the adversary proceeding. Rule 8005 provides:

A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.... A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge.

Fed.R.Bankr.P. 8005.

■ The parties dispute which standard to apply to Bear Stearns' Rule 8005 motion to stay pending appeal. Trefny asserts that Bear Stearns' appeal is interlocutory and that this court should apply the Fifth Circuit's four-part test for a stay. Bear Stearns asserts that this court should apply the reasoning of a Seventh Circuit decision addressing a stay pending an appeal from an order denying enforcement of an arbitration provision.

The standard Trefny urges requires this court to determine: (1) whether Bear Stearns has made a showing of likelihood of success on the merits; (2) whether Bear Stearns has made a showing of irreparable injury absent a stay; (3) whether granting a stay would substantially harm Trefny; and (4) whether granting a stay would serve the public interest. *See United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38 (1983). The standard Bear Stearns urges is set out in *Bradford–Scott Data Corp., Inc. v. Physician Computer Network, Inc.*, 128 F.3d 504 (7th Cir.1997). In *Bradford–Scott*, the district court refused to stay litigation pending arbitration. On appeal, the defendants/appellants asked the Seventh Circuit to stay the proceedings in the district court pending the decision on appeal. The court of appeals held that the district court must stay the proceedings pending appeal because the benefits of the arbitration clause "may be lost or even turned into net losses, if it is necessary to proceed in both judicial and arbitral forums, or to do this sequentially." *Id.* at 506. The Seventh Circuit adopted close to an automatic stay pending appeal of an order denying a dismissal or stay pending arbitration.

This court has previously granted the stay. Under the test Bear Stearns urges, this court would clearly grant the stay. Under the four-prong test Trefny urges, this court finds that Bear Stearns has satisfied each prong of the test. As set out in detail below, Bear Stearns made a substantial showing of the likelihood of success on the merits. In *United States v. Baylor University Medical Center,* the Fifth Circuit stated that if the movant shows "a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting a stay," the court should issue the stay. 711 F.2d at 39; *see also In re Holtmeyer,* 229 B.R. 579, 582 (E.D.N.Y.1999) ("The cases also emphasize that the single most important factor is likelihood of success on the merits or a serious question going to the merits and a tipping of the equities in favor of the movant." (citing cases)).

The other three prongs are also satisfied. Bear Stearns will suffer irreparable injury absent a stay because it will be forced to participate in discovery under court order and its right to arbitrate the dispute will be jeopardized by such discovery. *See Bradford–Scott,* 128 F.3d at 506 ("Arbitration clauses reflect the parties' preference for non-judicial dispute resolution, which may be faster and cheaper. These benefits are eroded, and may be lost or even turned into net losses, if it is

necessary to proceed in both judicial and arbitral forums.... The worst possible outcome would be to litigate the dispute, to have the court of appeals reverse and order the dispute arbitrated, to arbitrate the dispute, and finally to return to court to have the award enforced."). Trefny, on the other hand, will not be harmed by the stay. The only harm to Trefny is the additional time until his claims against Bear Stearns are concluded. Although Trefny claims a risk of lost documents and dim memories, he makes no specific showing that documents are likely to be destroyed or lost; that individuals with critical information are ill, aged, or infirm; or that the time involved presents significant danger of lost or impaired evidence.

Finally, the public interest factor weighs in favor of Bear Stearns. As the *Bradford–Scott* court noted, "it is fundamental to a hierarchical judiciary that 'a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously.' " *Bradford–Scott*, 128 F.3d at 505 (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982)); *see also* James R. Foley, *Bradford–Scott Data Corp., Inc. v. Physician Computer Network, Inc.*, 13 Ohio St.J. On Disp.Resol. 1071, 1083 (1998) ("The assertion that, as a philosophical matter, the issue of arbitrability can be easily severed from the merits of a given dispute does not lead inexorably to the conclusion that a district court can continue to adjudicate the merits of a case while a court of appeals decides whether the district court is even the proper forum in which to proceed. On the contrary, when the question on appeal is arbitrability and a federal statute requires that arbitrable disputes be referred to arbitration upon proper demand, it cannot be said that the issue of the district court's power to proceed is not 'involved in the appeal.' ").

Applying these standards, this court stayed the adversary proceeding pending this appeal.

## B. Ripeness and Waiver

Trefny argues that Bear Stearns filed the Rule 8005 appeal prematurely because the bankruptcy court had not yet ruled on the motion to stay discovery pending the appeal. Trefny also asserts that Bear Stearns waived its right to seek a stay by the delay in asserting a right to a stay in this court. Trefny points out that Bear Stearns filed an earlier appeal from the bankruptcy court's refusal to stay discovery, voluntarily dismissed that appeal, then waited five months before requesting that this court stay the proceedings in the bankruptcy court pending the appeal.

■ As to Trefny's ripeness argument, this court agrees with Bear Stearns that Judge Leal effectively denied Bear Stearns' motion to stay discovery pending appeal when he granted Trefny's motion to compel the production of certain documents. The Rule 8005 motion in this court is ripe.

■ As to Trefny's waiver argument, this court finds that Bear Stearns has not waived its right to request a stay of discovery pending appeal. Bear Stearns timely appealed the bankruptcy court's denial of the motion to stay discovery pending appeal to another district court in this district. Bear Stearns voluntarily dismissed that appeal on January 4, 1999 because the motion to stay pending appeal filed in this court included discovery. "[B]ecause discovery was included in the Rule 8005 motion, Bear Stearns dismissed the appeal of the denial of the motion to stay discovery." (Docket Entry No. 10, p. 2). After the bankruptcy court ordered Bear Stearns to produce documents, Bear Stearns promptly moved in this court for a stay of discovery pending this court's resolution of the merits of the appeal. Bear Stearns did not delay so as to waive its right to request a stay of discovery pending appeal; the motion is not untimely.

■ Nor has Bear Stearns waived its right to request a stay of discovery by

participating in court-ordered discovery. In *Steel Warehouse Co., Inc. v. Abalone Shipping Ltd. of Nicosai,* 141 F.3d 234 (5th Cir.1998), the Fifth Circuit was presented with the question of whether a party had waived its right to enforce an arbitration agreement by participating in the litigation process. The court noted that the party asserting waiver carries a heavy burden and stated that:

> [t]he Appellants had to participate in the litigation in order to protect themselves if the district court chose not to stay the proceedings. Appellants' fears were justified, given the district court's ruling in this matter. Further, it was Steel Warehouse who filed this case to begin with, and the Appellants haven't done much other than defend themselves in this case. Appellants have not escalated this case, nor have they showered Steel Warehouse with interrogatories and discovery requests. Given these facts, there is no waiver in this case.

*Id.* at 238.

Trefny filed in the bankruptcy court a motion to compel the production of documents, asserting that Bear Stearns did not comply with the scheduling order designating August 17, 1998 as the final date for Rule 26(a)(1) disclosures. Trefny asserted that Bear Stearns "waived the right to not produce documents, because of the letter agreement executed by its counsel agreeing to the Rule 26 production." (No. H–98–3234, Docket Entry No. 81, ¶ 2). In response, Bear Stearns argued that it signed the scheduling order and identified documents in its initial disclosure, but that the letter agreement "does not indicate any waiver by Bear Stearns of any rights not to produce documents. The letter merely acknowledges that because documents of the trustee are subject to the control of the Assistant U.S. Attorney's Office, special procedures needed to be established in order for Bear Stearns to have access to those documents." (No. H–98–3234, Docket Entry No. 84, p. 2). Bear Stearns asserted that the bankruptcy

court should deny Trefny's motion to compel because "[t]he continuation of this proceeding in this Court, including discovery, defeats the point of the Federal Arbitration Act's allowance of an appeal of the Court's ruling on the arbitration issue. Therefore, Bear Stearns should not be required to participate in any discovery until the conclusion of all appeals." (*Id.,* p. 3) (citations omitted). Bear Stearns also argued that Trefny had refused to enter into a confidentiality agreement with Bear Stearns.

Bear Stearns sought to protect its right to assert the arbitration agreements while complying with the bankruptcy court's orders. The choices it faced were similar to those presented in *Steel Warehouse.* Bear Stearns' limited participation does not, as a matter of law, amount to a waiver of the right to request a stay of discovery pending appeal of its motion to dismiss or stay in favor of arbitration.

## C. The Motion to Abate or Transfer and the Motion to Consolidate

After the district court that originally referred this case to the bankruptcy court denied Bear Stearns' motion to withdraw the reference, Trefny filed in this court a motion to abate or transfer and to consolidate. (Docket Entry No. 16). Trefny asserts that the court in which the SIPC initially filed suit against MBM retains exclusive jurisdiction, including over appeals from the bankruptcy court's decision. The appeal of the bankruptcy court's denial of the motion to dismiss or to stay in favor of arbitration, Trefny asserts, should be decided only by the referring court. Trefny moves to transfer this action to the referring court in the interests of "judicial efficiency and fairness."

Bear Stearns responds that Trefny's motion is untimely, noting that Trefny filed his motion to transfer "*only after* he received (1) this Court's order, which granted Bear Stearns' motion to stay proceedings pending appeal and found that Bear Stearns' appeal had a substantial

likelihood of success on the merits, and (2) Judge Gilmore's order denying the motion to withdraw reference." (Docket Entry No. 17, p. 2). Bear Stearns also asserts that judicial economy requires the appeal to remain with this court: the appeal has been briefed to this court; this court has heard argument on the motion to dismiss or to stay in favor of arbitration; and this court has already ruled on the motion to stay proceedings pending appeal.[3]

This court agrees with Bear Stearns. This court is familiar with the briefs on the merits of the arbitration issue, and in this memorandum and opinion, decides the arbitration issue. Trefny has not presented this court with a sufficient reason to abate or transfer the case to the other federal district court in this division, or to consolidate the two cases.[4] Trefny's motion to abate or transfer, and his motion to consolidate, is DENIED.

## IV. The Statutes at Issue

### A. The Federal Arbitration Act

■ The Federal Arbitration Act provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA "place[s] arbitration agreements upon the same footing as other contracts." *Gilmer v. Inter-*

state/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

■ The FAA embodies a strong federal policy in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The FAA requires courts rigorously to enforce agreements to arbitrate, even when a party bound by the agreement asserts a claim based on statutory rights. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

The FAA provides for a stay of a court proceeding when an issue in the proceeding is referable to arbitration. *Gilmer*, 500 U.S. 20, 111 S.Ct. at 1651. 9 U.S.C. § 3 provides in pertinent part that:

[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Section 16 of the Federal Arbitration Act allows immediate appeal from an order denying a stay under section 3 of the Act. *See In re National Gypsum*, 118 F.3d at 1061–62 & n. 11 ("A bankruptcy court's refusal to stay an adversary proceeding pending arbitration,

---

**3.** Bear Stearns also moves to vacate the order denying withdrawal of the reference, issued by the referring district judge, because of the stay over all proceedings pending resolution of this appeal. The district court that initially referred the trustee's suit against MBM was not presented with, and did not decide, the issue of whether Trefny's causes of action should be dismissed or stayed in favor of arbitration. That court merely noted the presence of the bankruptcy claims in the pleadings before denying Bear Stearns' mo-

tion to withdraw the reference. Bear Stearns' request for this court to vacate that order is now moot.

**4.** The district court that initially referred the case to the bankruptcy court does not have exclusive jurisdiction so as to receive all the appeals from the bankruptcy court's rulings. To the contrary, such appeals are randomly assigned.

though inherently interlocutory in nature, is nevertheless appealable because of section 16 of the Federal Arbitration Act.").

## B. The Securities Investor Protection Act

The SIPA dates back to the 1960s, when the securities industry experienced a business contraction that led to the failure or instability of numerous brokerage firms. Customers of these failed broker-dealers found their cash or securities on deposit dissipated or tied up in lengthy bankruptcy proceedings. Otherwise solvent broker-dealers that had open transactions with failed firms were threatened as well. "Congress enacted the [Securities Investor Protection Act] to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).

The SIPA created a new form of liquidation proceeding applicable to member firms, to ensure the completion of open transactions and the prompt return of customer property. *Barbour*, 421 U.S. at 416, 95 S.Ct. 1733. In addition, the SIPA created the SIPC, a nonprofit membership corporation to which most registered broker-dealers must belong. 15 U.S.C. § 78ccc(a). Finally, the SIPA required the SIPC to establish and maintain a "SIPC Fund" by levying assessments on its members. 15 U.S.C. § 78ddd. When necessary, the SIPC draws on this fund to satisfy the claims of the "customers"[5] of a failed broker-dealer for cash or securities. The SIPA contemplates that customers' claims will be satisfied to the greatest extent possible from the assets of the failed firm. The SIPC fund supplements those assets, protecting customers' cash balances up to $100,000 and total cash and securities up to $500,000. 15 U.S.C. § 78fff–3; *SIPC v. Ambassador Church Fin./Dev. Group, Inc.*, 788 F.2d 1208, 1209 (6th Cir.1986).

To ensure the prompt payment of customers' claims, the SIPC advances funds to a trustee for payment to customers. The SIPC becomes subrogated to the claims of such customers to the extent of the advances. 15 U.S.C. § 78fff–3(a). The SIPC entitles a customer to satisfaction of its "net equity" claim: the dollar amount of the customer's account which would have been owed by the debtor broker-dealer if the debtor had liquidated the securities positions of the customer on the filing date, less any indebtedness of the customer to the debtor. 15 U.S.C. § 78lll(11). The SIPC is authorized to advance to the trustee the money required to pay such claims to the extent that they exceed the customer's ratable share of the customer property; when the SIPC does so, it obtains the subrogation rights set forth in section 78fff–3(a):

5. "Customer" is defined in the SIPA as follows:

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter, except that SIPC as subrogee may assert no claim against customer property until after the allocation thereof to customers....

A SIPA liquidation is, in many respects, handled as a bankruptcy proceeding, but for a specific statutory purpose. *SIPC v. Ambassador Church Fin./Dev. Group*, 788 F.2d 1208, 1210 (6th Cir.1986). Section 78fff(b) states that "[t]o the extent consistent with the provisions of [SIPA], a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of Title 11." 15 U.S.C. § 78fff(b). Under the SIPA, the trustee is vested with the "same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11." 15 U.S.C. § 78fff–1(a). "The purpose of SIPA is to return to customers of brokerage firms their property or money. 15 U.S.C. § 78fff(a) provides that 'the purposes of a liquidation proceeding shall be ... to deliver customer name securities to or on behalf of the customers of the debtor ...; and ... to distribute customer property and ... otherwise satisfy net equity claims of customers....' " *In re Government Securities Corp.*, 972 F.2d 328, 331 (11th Cir.1992) (quoting 15 U.S.C. § 78fff(a)).

In this case, the statutory claims of the customers of MBM have been satisfied, to the limits of the SIPA, using SIPC funds. The issue is the extent to which the trustee's claims asserted in an adversary proceeding in bankruptcy court against a nondebtor third party, Bear Stearns, are subject to the arbitration provisions in an agreement between the third party and the debtor and in agreements between the third party and the debtor's customers.

## C. The Bankruptcy Code and Arbitration

In *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Supreme Court, noting the FAA's strong federal policy in favor of arbitration, stated:

> The Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent "will be deductible from [the statute's] text or legislative history," or from an inherent conflict between arbitration and the statute's underlying purposes.

*McMahon*, 482 U.S. at 226–27, 107 S.Ct. 2332 (citations omitted).

In *In re National Gypsum Co.*, 118 F.3d 1056 (5th Cir.1997), the Fifth Circuit decided whether, assuming a valid and enforceable arbitration agreement, a bankruptcy court has "discretion to decide not to stay the adversary proceeding pending arbitration under the Act." *Id.* at 1061. The court cited "the Supreme Court's admonition" in *McMahon* that, "in the absence of an inherent conflict with the purpose of another federal statute, the Federal Arbitration Act mandates enforcement of contractual arbitration provisions." *Id.* at 1067. Cases in other circuits focus on whether the claims are core or non-core;[6] these circuits adopt a cate-

---

**6.** Section 157(b)(2) of the Bankruptcy Code provides a nonexclusive list of core proceedings, including "proceedings to determine, avoid, or recover fraudulent conveyances"; and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal

gorical rule that core matters inherently conflict with the FAA and cannot be compelled to arbitration. The Fifth Circuit expressly rejected that approach. *Id.* at 1066–67. The Fifth Circuit stated that it could not find "such an inherent conflict based solely on the jurisdictional nature of a bankruptcy proceeding." *Id.* at 1067. The Fifth Circuit stated:

> [A]t least where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by a debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.

*Id.* at 1069.

■ The Fifth Circuit directed the use of a two-part test for determining whether to enforce an arbitration provision. The court must first determine "whether the proceeding derives exclusively from the provisions of the Bankruptcy Code." *Id.* at 1069. If the proceeding does derive exclusively from the Code, the court must determine "whether arbitration of the proceeding would conflict with the purposes of the Code." *Id.*

In *National Gypsum,* the Fifth Circuit upheld the bankruptcy court's decision not to enforce the arbitration clauses, noting that the only rights involved were created by the Bankruptcy Code and did not derive from the debtor's prepetition property or rights. *Id.* at 1070. In this case, Trefny asserts that his claims are exclusively created by the SIPA and/or the Bankruptcy Code and are not arbitrable. Bear Stearns asserts that Trefny's claims are primarily fraud and tort causes of action that do not arise under the Bankruptcy Code, are not core claims, and do not conflict with the Bankruptcy Code.

## V. The Appeal of the Denial of the Motion to Dismiss or Stay Pending Arbitration

The two substantive issues presented by Bear Stearns' appeal of the bankruptcy court's denial of the motion to dismiss or to stay to permit arbitration are: (1) whether Trefny and the claims he asserts against Bear Stearns are covered by the arbitration agreements; and (2) if Trefny is covered by the arbitration agreements, whether the SIPA and/or the Bankruptcy Code preclude arbitration of all, or any, of the claims he alleges.

### A. The SIPA Trustee, the Non–Bankruptcy Code Claims, and the Agreements to Arbitrate

■ Trefny does not assert that the arbitration agreements are invalid. Nor does Trefny challenge the broad scope of the arbitration clauses. Trefny does not dispute, and this court finds, that the arbitration agreements are valid and would cover the disputes and transactions at issue if asserted by the signatories. Rather, Trefny argues that he is simply not bound by the arbitration clauses in either the

---

injury tort or wrongful death claims." 28 U.S.C. § 157(b)(2)(H), (O). In *In re Wood,* the Fifth Circuit stated the difference between core proceedings and non-core proceedings:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for

example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but under section 158(c)(1) it is an "otherwise related" or non-core proceeding.

825 F.2d 90, 96–97 (5th Cir.1987).

customer agreements or the clearing agreement because he did not sign them. Trefny also asserts that his status as a SIPA trustee allows him to escape enforcement of the arbitration agreements signed by the debtor and the debtor's customers before the liquidation began.

■ As to Trefny's assertion that he is not bound by the arbitration clauses because he did not sign the agreements, the law is clear that a nonsignatory to an agreement containing an arbitration clause may be treated as bound by the arbitration agreement under ordinary contract or agency principles, including principles of assignment or subrogation. *See Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir.1990) (citing *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 938 (3d Cir.1985), *overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir.1993); *In re Oil Spill by Amoco Cadiz*, 659 F.2d 789, 795–96 (7th Cir.1981); *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir. 1975)). The debtor, and the customers, each signed valid arbitration agreements with Bear Stearns that apply broadly to "all claims." These agreements bind Trefny to the extent that they bind the signatories when Trefny asserts claims derived from, or on behalf of, those signatories. *See, e.g., Cadle Co. v. 1007 Joint Venture*, 82 F.3d 102, 105 (5th Cir.1996) ("An assignee stands in the shoes of his assignor."); *National Dev. Co. v. Khashoggi*, 781 F.Supp. 959, 963 (S.D.N.Y.1992) ("An individual or entity can be a party to an arbitration agreement by virtue of its status as alter ego of a signer of the agreement" (citing *Fisser v. International Bank*, 282 F.2d 231, 234–35 (2d Cir.1960)); *see also Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995) ("[W]e have recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.");

*Monroe Banking & Trust Co. v. Allen*, 286 F.Supp. 201, 208 (N.D.Miss.1968) (applying the law of assignments to conclude that one "is bound by the terms of the contract to the same extent as [the] assignor").

■ Trefny argues more precisely that his status as a SIPA trustee keeps him from being bound by the arbitration agreements, regardless of the source of the assigned or subrogated claims he asserts. (Docket Entry No. 4, pp. 2–5). Trefny characterizes his claims against Bear Stearns as having two bases. The first is the assignment from MBM's customers "satisfied in the liquidation proceedings by the Trustee for MBM Investment Corporation" of their claims against third-parties. (No. H–98–3234, Docket Entry No. 46, Second Amended Complaint, ¶ 3). The second is the right to recover funds on behalf of the debtor's estate, as "enforcer of the statutory subrogation rights of the [SIPC]." (*Id.*) Trefny argues that he derives the right to assert these claims because of his status as a SIPA trustee. Trefny argues that because he is enforcing his statutory right of subrogation against Bear Stearns, he cannot be compelled to arbitrate. The statute and the case law, however, do not support Trefny's characterization of his status.

The SIPA provides that to the extent the SIPC advances funds to the trustee to pay customer claims, the SIPC is subrogated to the claims of such customers. 15 U.S.C. § 78fff–3(a). Claims that the SIPC holds as subrogee for the claims of customers may be satisfied from customer property. If, as here, the customer property is insufficient, the SIPC may assert, as subrogee, the claims of the customers in order to repay to the SIPC the funds it advanced. The SIPC is subrogated to the claims of customers against the debtor for the net equity claims that the SIPC paid to the customers. The SIPC may assert such claims against the liquidating member firm and the controlling persons of such firms. However, several courts have held that there is no statutory authority

for the SIPC to assert such rights against third parties, such as Bear Stearns. Although these courts recognize a trustee's ability to pursue subrogation claims against entities other than the estate of the broker-dealer, this authority is based on common law, not on the SIPA.

In *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir.1978), *rev'd on other grounds*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the SIPC asserted a right to sue an accounting firm on behalf of customers of an insolvent broker. The accounting firm argued that the trustee's right of subrogation was limited to suing the debtor's estate and that there was no common law right to assert the subrogated claims against a third party. The Second Circuit agreed that the trustee had no statutory right to assert such claims, but disagreed as to the common law. Relying on general principles of insurance law, the court noted that upon payment of a loss, an insurer is entitled to be subrogated to any right of action that the insured may have against a third party whose wrongful act caused the loss. The court stated:

> [W]e believe that it is more in keeping with the intent of Congress that wrongdoers not receive a windfall benefit from the existence of SIPC, and that SIPC be able to recoup its losses from solvent wrongdoers. Accordingly, we find that SIPC is subrogated to the right of action implied in section 17 in favor of brokers' customers against third parties such as accountants.

*Id.* at 624. In *Appleton v. First National Bank of Ohio*, 62 F.3d 791 (6th Cir.1995), the court, citing *Redington*, held that a SIPA trustee had a common law right of subrogation to the claims of customers the SIPC paid, to sue third party banks that had accepted checks with restrictive endorsements. The court emphasized that the trustee's right to proceed against the third party, rather than against the debtor's estate, was not a statutory right of subrogation under the SIPA, but rather a common law right of subrogation. *Id.* at 799–800.

In this case, Trefny's claims against Bear Stearns for Texas common law and statutory causes of action, derived from MBM's customers,[7] are subject to arbitration. These customers each signed customer agreements with broad arbitration clauses. The debtor, MBM, also signed an arbitration agreement. As to claims or causes of action derived from either the debtor or from the customers, Trefny is subject to arbitration to the same extent as the debtor or customers would have been.

In *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir.1989), the court of appeals rejected an argument similar to the one Trefny asserts. In *Hays*, the bankruptcy trustee argued that he was simply not bound by the debtor's prepetition arbitration agreement with its brokerage firm. The trustee sued the brokerage house under both state and federal causes of action for damages and equitable claims under section 544 of the Bankruptcy Code. The district court held that the trustee was not bound by the customer agreement the debtor had signed with the brokerage firm because neither the trustee nor the creditors it represented had signed the agree-

---

7. Trefny's claims for a private right of action for damages for violations of federal criminal statutes are also derived from the customers, who assigned their claims to Trefny in exchange for the receipt of SIPC funds. In the case brought by Interdrill against Bear Stearns, *Interdrill, Inc. v. Bear Stearns Securities Corp., and Bear Stearns & Co.*, No. H–98–3597, and in *Joaquin Lamuno Otaolaurruchi, et al., v. Bear Stearns Securities Corp., and Bear Stearns & Co.*, No. H–98–3591, the dis-

trict court judge dismissed both plaintiff's claims under federal and state criminal statutes because "private citizens and entities ... cannot assert claims under criminal statutes." (No. H–98–3597, Docket Entry No. 55, p. 5); (No. H–98–3591, Docket Entry No. 42, pp. 5–7) (both citing *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1366 (9th Cir. 1987); *Sattler v. Johnson*, 857 F.2d 224, 226–27 (4th Cir.1988)).

ment. *Id.* at 1151. The Third Circuit reversed.

The appeals court rejected the trustee's "primary argument that it is free to ignore the Customer Agreement altogether." *Id.* at 1155. The court held that the trustee was bound by the arbitration clause of the customer agreement with respect to claims inherited from, or derived from, the debtor, who had signed an arbitration agreement.

In this case, the result in *Hays* is supported by an additional factor not present in that case. Not only did MBM, the debtor, sign a broad arbitration agreement with Bear Stearns; so did the customers for whose benefit the trustee pursues the SIPA claims in the bankruptcy court. As the court noted in *Hays,* the " 'preeminent concern of Congress in passing the [Federal Arbitration] Act was to enforce private arbitration agreements into which the parties had entered'.... Thus there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." 885 F.2d at 1159 (citations omitted). In this case, by contrast, the individuals in the position of the creditors in *Hays* are the customers. In this case, both the customers and the debtor entered into otherwise enforceable arbitration agreements with the non-debtor defendant. "The trustee-plaintiff stands in the shoes of the debtor for the purposes of the arbitration clause and the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays,* 885 F.2d at 1153.

In *Hays,* the court held that as to the claims derived from a party that has signed an arbitration clause, the trustee is bound to arbitrate such claims. The court

required the trustee to arbitrate the federal RICO and securities fraud causes of action. The court did not, however, require arbitration of the trustee's avoidance action under section 544(b) of Title 11, finding that it was a statutory cause of action under the Bankruptcy Code, not derived from the debtor and not subject to arbitration. *Id.* at 1155. In this case, Trefny's alternative position is that his claims for turnover under section 542, and for fraudulent transfer under section 548, are core proceedings that derive exclusively from the Bankruptcy Code and are not arbitrable. Trefny also asserts that the entire SIPA statutory proceeding is a core proceeding because it could arise only in the context of bankruptcy.

Bear Stearns argues that Trefny "has failed to plead any cause of action that would cause this proceeding to derive from the Bankruptcy Code." (Docket Entry No. 2, p. 15). Bear Stearns also asserts that, even if Trefny had alleged a colorable claim under the Bankruptcy Code, Trefny has failed to show that the "proceeding" derives "exclusively" from the provisions of the Bankruptcy Code because non-bankruptcy issues predominate. The issue is whether the claims under the Bankruptcy Code, or, as Trefny asserts, any statutory claims under the SIPA, are exempt from arbitration.

**B. The Intersection of the Bankruptcy Code, the SIPA, and the Federal Arbitration Act**

Under both the *National Gypsum* test and the "core-noncore" test used in other circuits, this court must analyze each cause of action Trefny asserts to determine whether that claim should proceed in arbitration or in the bankruptcy court.[8]

---

8. This court rejects Bear Stearns' contention that the term "proceeding" in the bankruptcy context "is defined as a legal action, litigation or the instituting or conducting of legal action." (Docket Entry No. 7, p. 7). Each separate cause of action is analyzed to determine whether that claim is core or non-core. "[A] proceeding, as a whole, is determined to

be core or non-core; however, in reaching this determination, each cause of action and each cause of action asserted against each defendant, is separately examined." *In re Hughes–Bechtol, Inc.,* 141 B.R. 946, 949 (Bankr.S.D.Ohio 1992); *see also In re N. Parent, Inc.,* 221 B.R. 609, 626 (Bankr.D.Mass. 1998) ("[E]ach of Debtor's fourteen causes of

### 1. All Claims by a SIPA Trustee

Trefny broadly argues that any SIPA claim " 'is *ipso facto* ' a core proceeding, because by statute it can only arise within the context of the Bankruptcy Code and a bankruptcy court." (Docket Entry No. 4, p. 11). Trefny cites SIPA sections that confer exclusive jurisdiction in the bankruptcy court over all property related to the liquidation proceeding (§ 78eee(b)(2)(A)); that confer jurisdiction over cases arising under Title 11 (§ 78eee(b)(2)(A)(iii)); and that provide for removal of the liquidation proceeding to the bankruptcy court (§ 78eee(b)(4) and § 78fff(b)). Trefny asserts that a SIPA proceeding is essentially a bankruptcy proceeding.

Bear Stearns responds that the "SIPA neither adds nor detracts from what is a core proceeding under the Bankruptcy Code. To interpret SIPA to create 'core' jurisdiction for any case filed as an adversary proceeding to a SIPA case is completely contrary to Supreme Court decisions and Congress's limits on bankruptcy court jurisdiction." (Docket Entry No. 7, p. 5 n. 2).

■ "Title 15 United States Code § 78fff(b) states that a liquidation proceeding under the SIPA is to be conducted 'in accordance with, and as though it were being conducted under . . . Title 11.' " *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1560 (10th Cir.1993). Bankruptcy courts have jurisdiction over actions pursued under the SIPA. However, bankruptcy courts are courts of limited jurisdiction. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon*, the debtor filed suit on a pre-petition state law breach of contract claim. The Supreme

Court, without a majority opinion, declared the Bankruptcy Act of 1978 unconstitutional because it permitted bankruptcy courts to adjudicate state law claims unrelated to federal law. A plurality of the Supreme Court recognized a distinction between "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power," and the "adjudication of state-created private rights, such as the right to recover contract damages." *Id.* Following *Marathon*, Congress drew on the "core" terminology to describe matters or proceedings that are an integral part of the bankruptcy case, compared to matters "related to" bankruptcy, that are peripheral to the concerns of the bankruptcy case and based on extrinsic sources of law.

■ The fact that the SIPA confers jurisdiction on the bankruptcy court over property related to a liquidation, and the fact that the SIPA provides for removal to the bankruptcy court, does not transform every cause of action in an adversary proceeding pursued by a SIPA trustee into a core proceeding. This case is in itself an example. In his original complaint, Trefny asserted no bankruptcy law causes of action against Bear Stearns. The state and federal tort causes of action for damages that Trefny initially asserted do not "arise under" the Bankruptcy Code or "arise in" bankruptcy simply because they were asserted by a SIPA trustee. Such a holding would "run afoul of the jurisdictional limitations set out in *Marathon*." *In re Rarick*, 132 B.R. 47, 51 (D.Colo.1991).

■ Neither Trefny's status as a SIPA co-trustee nor the fact that he derives authority from the SIPA is sufficient to preclude arbitration under *National Gypsum*. This court has already determined

action will have to be separately analyzed to determine whether it falls within the bankruptcy court's core jurisdiction."); *In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 368 (Bankr.S.D.N.Y.1998); *Ralls v. Docktor Pet Ctrs., Inc.*, 177 B.R. 420, 425 n. 6 (D.Mass. 1995) ("The 'proceeding' must refer to each cause of action or right of recovery pled.

This is the only interpretation which would adequately heed the constitutional concerns in *Marathon* . . . . Each claim must, on its own, satisfy the requirements of § 157(b). A district court must scrutinize each count and each asserted right for relief to determine which ones were properly before the [court.]").

that the Texas state law claims and the causes of action based on federal criminal statutes are "derived" from the debtor and the customers. As to these claims, under the *National Gypsum* approach or the *Hays* approach, the parties are bound by the broad contractual agreements to arbitrate. This court must analyze the two Bankruptcy Code claims Trefny asserts to determine whether, under *National Gypsum*, they are exempt from enforcement of the arbitration provisions.

Trefny asserts that he is entitled to turnover relief under section 542 of Title 11 and to recovery for fraudulent transfers of property under section 548(a)(1) of Title 11. The issue is whether the invocation of these causes of action "unique to the trustee under the Bankruptcy Act" make those causes of action exempt from the arbitration provisions.

### 2. The Section 542 Claim

■ Bear Stearns asserts that Trefny's section 542 turnover claim is "hollow" and cannot serve as a basis for precluding arbitration because section 542 applies only when another party is in possession, custody, or control of property of the debtor, and the claim is without dispute.

■ Turnover proceedings are core proceedings under section 157(b)(2)(E) of the Bankruptcy Code. *See In re Republic Reader's Serv., Inc.,* 81 B.R. 422, 427 (Bankr.S.D.Tex.1987). However, turnover proceedings under section 542 "are not to be used to liquidate disputed contract claims." *In re Charter Co.,* 913 F.2d 1575, 1579 (11th Cir.1990). Congress intended 11 U.S.C. § 542 to apply to claims for "tangible property and money due to the debtor without dispute which are fully matured and payable on demand." *Id.* (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 202–03, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)). "Congress intended to ease reorganization by allowing the debtor to obtain funds immediately necessary for survival—not all funds, only those not in dispute." *Id.* (citing *In re Chick*

*Smith Ford,* 46 B.R. 515, 518 (Bankr. M.D.Fla.1985); *In re Archer,* 34 B.R. 28 (Bankr.N.D.Tex.1983)). "Unless and until Debtor's claims against the defendants are liquidated in a court of competent jurisdiction or by agreement, they cannot be enforced here through a turnover order." *In re Satelco, Inc.,* 58 B.R. 781, 786 (Bankr. N.D.Tex.1986); *see also In re Theobald Indus., Inc.,* 53 B.R. 506, 508 (Bankr. D.N.J.1984) ("Since the right to the payment of the claims [asserted by the estate] is contingent on a judgment establishing liability, the claims are not 'matured' . . . Section 542(b), dealing only with matured claims, is inapplicable here.").

The claims Trefny asserts against Bear Stearns are neither liquidated nor undisputed. Trefny has not asserted a turnover claim under 11 U.S.C. § 542 that precludes arbitration.

### 3. The Section 548 Claim

■ Bear Stearns argues that Trefny has not pleaded a proper claim under section 548 for fraudulent transfer. Pointing out that section 548 applies only to a "transfer of an interest of the debtor in property," Bear Stearns asserts that Trefny challenges transactions involving non-debtors. Trefny alleges that "[t]he Mannai Bond transactions, and perhaps others, were fraudulent transfers which may be avoided by the Co-Trustee." (No. H–98–cv–3234, Docket Entry No. 46, Second Amended Complaint, ¶ 21). Trefny pleads the facts pertinent to his fraudulent transfer claim as follows:

> Juan Carlos Martinez, and perhaps others, acting for MBM and with actual intent to hinder, delay or defraud its customers authorized the purchase of the Mannai Bonds in MBM customer accounts and the sale of securities in those accounts to pay for the bonds without the customers' approval. At the time of their purchase, Bear, Stearns (sic) owned the Mannai Bonds and was the de facto underwriter for them, hav-

ing purchased them from Valmet. Bear, Stearns was the initial transferee of the funds and securities and knew of the fraudulent nature of the transfers. Bear, Stearns took the securities and cash from the MBM customer accounts knowing that the transaction was inappropriate or illegal for many, if not all, of the accounts. Bear, Stearns was not a good faith transferee of the securities and funds from the customer accounts.... Recovery of these funds is for the benefit of the Estate.

(*Id.*).

Bear Stearns argues that Trefny has not pleaded a claim under section 548 because Trefny has not alleged a transfer of property of the debtor, MBM. Bear Stearns asserts that section 78fff–2(c)(3) does not "magically transform" the property at issue here into property of the debtor.

Trefny asserts that he is "pursuing property which, although it did not belong to the debtor, is deemed to be property of the debtor." (Docket Entry No. 4, p. 3). The right to pursue this property is statutorily created. Trefny asserts that because he is not relying on the debtor's rights in bringing these claims, but rather on Trefny's own statutory rights as a SIPA trustee, he is not covered by the arbitration agreement. Trefny argues that the stocks and bonds that were sold in the customers' accounts to pay for the purchase of the Mannai Bonds are property of the debtor's estate: "Bear Stearns took the stocks and bonds MBM had pur-

chased on behalf of its customers and sold them, replacing them with Mannai bonds." (Docket Entry No. 4, p. 13). Trefny uses section 78fff–2(c)(3) of the SIPA, which treats property transferred by the debtor as "customer property" that is deemed to be property of the debtor for the purpose of the trustee's recovery of such property, to support his argument.[9]

The SIPA defines "customer property" as follows:

> The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

15 U.S.C. § 78lll(4). Section 78fff–2(c)(3) "creates a legal fiction which treats securities as if they were owned by the debtor prior to transfer; and, if the transfer was for the benefit of the customer, treats the customer as if it were a creditor." *In re Bevill, Bresler & Schulman, Inc.*, 94 B.R. 817, 825 (D.N.J.1989). "This fiction relieves the Trustee from having to prove (as he might have to if proceeding solely under section [548]) that the securities in question are property of the estate. The Trustee need only prove that the property in question was 'customer property' as defined by SIPA." *Id.* The purpose of this fiction is to "enable the trustee to fit the

---

**9.** The SIPA provides for "recovery of transfers" under 15 U.S.C. § 78fff–2(c)(3):

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or

for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding. 15 U.S.C. § 78fff–2(c)(3). Section 78fff–2(c)(3) comes into effect when the customer's property held by the debtor is not sufficient to pay customers' claims in full. Section 78fff–2(c)(3) operates to allow the trustee to avoid certain transfers of property so that the trustee can include that property in the estate of the debtor for return to the customers. *See In re Bevill, Bresler & Schulman, Inc.*, 94 B.R. 817, 824–27 (D.N.J.1989). The power conferred under section 78fff–2(c)(3) operates only if and to the extent the transfer is "voidable or void under the provisions of Title 11."

transfer into the provisions of the avoidance sections of the Code." *In re Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 894 (D.N.J.1988) (quoting 4 COLLIER ON BANKRUPTCY, 749.02[2], at 749–3 (15th ed.1987)).

The case law and the purpose of section 78fff–2(c)(3) and Bankruptcy Code section 548 do not support Trefny's argument. Section 548 allows the bankruptcy trustee to avoid fraudulent transfers "of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition." 11 U.S.C. § 548(a)(1). The purpose of allowing a trustee to avoid such transfers is to prevent the debtor from disposing of his property with the intent or effect of placing it beyond the reach of the debtor's creditors. *See, e.g., In re Acequia, Inc.*, 34 F.3d 800, 804 (9th Cir.1994) ("Under section 548(a)(1), 'the transfer of any interest in the property of a debtor, within one year of the filing of a petition in bankruptcy, is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing property from their reach.' " (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir.1991))). If Trefny had alleged that MBM had transferred property or money to Bear Stearns to keep it out of the reach of the trustee and the debtor's estate, the application of section 548 would be consistent with the Code and the cases. What Trefny alleges, however, is quite different. Trefny does not seek a return of money or property transferred from MBM to Bear Stearns with the intent or effect of placing it beyond MBM's creditors. Rather, Trefny alleges that Bear Stearns purchased Mannai Bonds in the accounts of MBM customers and sold other securities in those customers' accounts to pay for the bonds. Trefny seeks "either the fair market value of the good securities removed from customer accounts, or the replacement of such securities in exchange of the Mannai bonds ... for the benefit of the

Estate." (No. H–98–3234, Docket Entry No. 46, Second Amended Complaint, ¶ 21). Trefny alleges that Bear Stearns transferred property of the customers, not property of the debtor, MBM. Trefny has not alleged a transfer of "an interest of the debtor in property."

Trefny asserts that although the property did not belong to the debtor, it is considered property of the debtor by virtue of section 78fff–2(c)(3) of the SIPA. There is scant case law discussing this section, but the reported cases do not help Trefny's argument. In the reported cases, the SIPA trustee sought to avoid transfers of securities from the debtor brokerage firm to certain of the debtor's customers. *See, e.g., In re Adler, Coleman Clearing Corp.*, 218 B.R. 689 (Bankr.S.D.N.Y.1998) (involving a trustee seeking to cancel trades of certain blue chip stocks made during the debtor brokerage firm's final week of business to the debtor's favored customers); *In re Bevill, Bresler & Schulman, Inc.*, 94 B.R. 817 (D.N.J.1989) (involving recovery of transfers of Euro CDS from a safekeeping account of the debtor to the safekeeping accounts of two of the debtor's customers). The purpose of this section, as applied in these cases, is to prevent one or more customers from depriving other customers of assets by keeping these assets out of the "pool" available for distribution to customers on a ratable basis. The purpose is to prevent the customers of the debtor from "using a technical reading of [the bankruptcy code] to retain securities that would otherwise be recoverable by the SIPA trustee." *In re Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 894 (D.N.J.1988).

In this case, Trefny seeks essentially the same relief he seeks through his state law fraud and tort claims against Bear Stearns: to recover the losses resulting from the alleged misrepresentations and other misconduct that led to the purchase of the Mannai Bonds. The facts of this case simply do not fit within the situation against which section 78fff–2(c)(3) or the

SIPA itself was designed to protect. SIPA "affords limited financial protection to the customers of certain stockbrokers experiencing financial difficulties." *In re Adler, Coleman Clearing Corp.*, 218 B.R. at 695 (citing *SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975)). The Act was designed to protect customers of registered broker-dealers that are being liquidated. "The SIPA protects investors when a broker holding their assets becomes insolvent. It does not comprehensively protect investors from the risk that some deals will go bad or that some securities issuers will behave dishonestly." *In re Brentwood Securities, Inc.*, 925 F.2d 325, 330 (9th Cir.1991). The causes of action that Trefny pursues are properly characterized as tort claims of fraud; the recovery he seeks is properly characterized as the recovery of money or securities lost because of the alleged fraud. This action is not properly characterized as the recovery, under section 548 of the Bankruptcy Code, for fraudulent transfer of an interest of the debtor in property.

Even if Trefny has pleaded a section 548 claim that, at least to some extent, is not inherited from the debtor's prepetition property, but is rather a right created solely by the Bankruptcy Code, he still fails the *National Gypsum* test. Under *National Gypsum*, the bankruptcy court has the discretion to deny enforcement of the arbitration clause under certain defined circumstances. *In re National Gypsum*, 118 F.3d at 1070. In this case, the bankruptcy court did not analyze whether requiring the parties to arbitrate the section 548 claim would seriously jeopardize the underlying policies of the Bankruptcy Code. However, this court concludes that it would be an abuse of discretion to find such a conflict between the parties' contractual arbitration rights and the Federal Arbitration Act on the one hand, and the Bankruptcy Code on the other hand, so as to preclude arbitration in this case.

### 4. Whether Trefny's Section 548 Claim Conflicts with the FAA

The parties dispute whether the SIPA and the Bankruptcy Code inherently conflict with the Federal Arbitration Act and its mandate of enforcing contractual arbitration agreements. "[T]he party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of that other statute." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *see also In re National Gypsum*, 118 F.3d at 1065; *In re Bailey, II*, 217 B.R. 523, 525 (Bankr.E.D.Tex.1997) (both quoting *Shearson*).

Trefny argues that the SIPA's statement of exclusive jurisdiction in the bankruptcy courts shows that Congress intended to preclude arbitration of claims arising in a SIPA proceeding and that the policies of the two acts inherently conflict. Bear Stearns asserts that Trefny has not met his burden of showing that the SIPA and the Bankruptcy Code preclude arbitration or inherently conflict with the FAA; Trefny has not shown that Congress intended to preclude arbitration. Bear Stearns points out that when Congress amended the SIPA in 1987, Congress did not include a provision precluding arbitration of SIPA claims. Bear Stearns also points out that the Supreme Court has repeatedly held securities claims arbitrable, even claims that arise under federal statutes purporting to lodge exclusive jurisdiction in the federal courts. *See Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 238, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) ("Congress did not intend for § 29(a) to bar enforcement of all predispute arbitration agreements. In this case, where the SEC has sufficient statutory authority to ensure that arbitration is adequate to vindicate Exchange Act rights, enforcement does not effect a waiver of 'compliance

with any provision' of the Exchange Act under § 29(a). Accordingly, we hold the [ ] agreements to arbitrate Exchange Act claims 'enforce[able] . . . in accord with the explicit provisions of the Arbitration Act.' "). Bear Stearns asserts that Congress did not intend to preclude a waiver of judicial remedies by placing jurisdiction over SIPA proceedings in the bankruptcy courts.

Section 78eee(b)(2) sets out the jurisdiction and powers of the court in a SIPA proceeding:

(A) Exclusive Jurisdiction

Upon the filing of an application with a court for a protective decree with respect to a debtor, such court—

(I) shall have exclusive jurisdiction of such debtor and its property wherever located (including property located outside the territorial limits of such court and property held by any other person as security for a debt or subject to a lien);

(ii) shall have exclusive jurisdiction of any suit against the trustee with respect to a liquidation proceeding; and

(iii) except as inconsistent with the provisions of this chapter, shall have the jurisdiction, powers, and duties conferred upon a court of the United States having jurisdiction over cases under Title 11, together with such other jurisdiction, powers, and duties as are prescribed by this chapter.

15 U.S.C. § 78eee(b)(2)(A).

■ "Despite the encompassing appearance of that statute's language, the authority conferred by that section must still co-exist with the Court's lack of Article III case and controversy standing." *In re Bell & Beckwith,* 39 B.R. 914, 917 (Bankr.N.D.Ohio 1984). In *Bell & Beckwith,* the SIPA trustee argued that the district court had jurisdiction over a state law breach of contract action under section 78eee(b) because the court "has been given statutory authority to hear all matters relating to the liquidation of the brokerage

under the Securities Investor Protection Act." The court stated that:

[f]ollowing the reasoning set forth in [*Marathon*], to the extent that the enactment of the Bankruptcy Code was inadequate to confer case and controversy authority on the Bankruptcy Judges, the statutory authority of 15 U.S.C. § 78aaa *et seq.* is similarly inadequate to overcome their lack of Article III status. Without the constitutional prerequisites set forth in Article III, this Court is without subject matter jurisdiction to hear civil actions which are related proceedings whenever a proper objection to jurisdiction is made, regardless of whether the related proceedings are brought in a case under Title 11 or Title 15.

*Id.* Because Congress could not have intended to extend a bankruptcy court's jurisdictional reach beyond permissible bounds, Congress did not intend the exclusive jurisdiction provision in 78eee(b) to preclude the litigation of every case involving the SIPA in a forum other than a bankruptcy court.

■ As to whether Congress intended to preclude arbitration of bankruptcy or SIPA disputes, this court notes that the SIPA specifically provides that "the provisions of the Securities and Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.] (hereinafter referred to as the '1934 Act') apply as if this chapter constituted an amendment to, and was included as a section of, such Act." 15 U.S.C. § 78bbb. The Supreme Court in *Shearson/American Express, Inc. v. McMahon* found that Congress did not intend the Securities and Exchange Act of 1934 to bar enforcement of all arbitration agreements. 482 U.S. at 238, 107 S.Ct. 2332. The SIPA does not exhibit a congressional intent to preclude the arbitration of disputes arising under the statute.

■ As to whether the policies under the Bankruptcy Code inherently conflict with the FAA, Trefny argues that the purposes of the Bankruptcy Code, as stat-

ed in *National Gypsum,* are "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." (Docket Entry No. 4, p. 11 (quoting *In re National Gypsum,* 118 F.3d at 1067)). Trefny asserts that his section 548 claim is a purely bankruptcy claim and that arbitration of the non-bankruptcy claims is contrary to these policies. This court finds unpersuasive Trefny's argument that arbitration of the claims he asserts against Bear Stearns would conflict with the Bankruptcy Code. The courts have pointed out that a liquidation under the SIPA is similar to a bankruptcy liquidation, but with a "key difference: a bankruptcy trustee has no trust fund to distribute to make creditors whole. Thus, bankruptcy law does not speak to the need, desirability, or authority for repaying that fund through subrogation actions such as the one at issue." *Appleton,* 62 F.3d at 799. The claims that Trefny asserts against the non-debtor third party, Bear Stearns, have purposes, unrelated to the Bankruptcy Code. As the *National Gypsum* court stated, "bankruptcy courts have discretion to deny enforcement of arbitration clauses in core cases when the *only* rights at issue were created by the Bankruptcy Code rather than inherited from a debtor's prepetition property." *In re National Gypsum,* 118 F.3d at 1071 (emphasis added).

Trefny's claims do not involve important bankruptcy policies. Trefny does not assert claims against the debtor's estate in this adversary proceeding. The resolution of the claims against Bear Stearns do not require allocating property of the debtor's estate among creditors. The resolution of the claims against Bear Stearns do not require interpreting whether an order discharging the debtor has been violated. Trefny's claims against Bear Stearns arose prepetition and could have been asserted prepetition. None of Trefny's claims require the interpretation of the SIPA or any technical provision of the Bankruptcy Code. The basis of Trefny's claims is that Bear Stearns committed fraud or actionable negligence. Arbitration of this issue does not implicate or conflict with the bankruptcy law or policies.

 The purpose of the Bankruptcy Code is to "protect[ ] the rights of creditors." *In re American Freight Sys., Inc.,* 164 B.R. 341, 347 (D.Kan.1994) (citing *In re FRG,* 115 B.R. 72, 75 (E.D.Pa. 1990)). In this case, the creditors—or customers—and the debtor have all signed arbitration agreements. Arbitration of Trefny's claims against Bear Stearns does not conflict with the policies behind the Bankruptcy Code. *See In re Chorus Data Sys., Inc.,* 122 B.R. 845, 852 (Bankr.D.N.H.1990) ("[T]he only proper inquiry for a bankruptcy court in these circumstances is whether the text or purposes of the Bankruptcy Code would be violated so significantly by enforcing an arbitration clause in the particular factual circumstances of the case before the Court that it can fairly be said that Congress could not have intended those provisions or purposes to be overridden by the Federal Arbitration Act.").

Under the standard set out in *National Gypsum,* this court ORDERS a stay of the bankruptcy action pending arbitration under the Federal Arbitration Act.

## VI. Conclusion

The bankruptcy court's order denying Bear Stearns' request for a stay pending arbitration is REVERSED. Because Trefny's claims must be arbitrated, this court ORDERS a stay of the bankruptcy proceeding against Bear Stearns pending arbitration and DISMISSES this appeal.